Celio DIAZ, Jr., individually and on behalf of all others similarly situated, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS, INC., a New York corporation licensed to do business in the State of Florida, Defendant.

No. 69-206-Civ.

United States District Court, S. D. Florida.

April 8, 1970.

Robert H. Burns, Miami Beach, Fla., for plaintiff.

James L. Armstrong, III, of Smathers & Thompson, Miami, Fla., for defendant, and Poletti, Freidin, Prashker, Feldman & Gartner, New York City, as co-counsel.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This is an individual and class action for an injunction and damages under Section 706(f) of Title VII of the Civil Rights Act of 1964 (the "Act"), 42 U.S.C. § 2000e–5(f), and under Rule 23 (b) (2) of the Federal Rules of Civil Procedure. It presents for judicial decision for the first time the interesting question of whether an airline violates the sex discrimination provisions of Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a), in following a policy of hiring only persons of the female sex as flight cabin attendants.

Section 703 of the Act provides, in part:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * *.

\* \* \* \* \* \*·

"(e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees * * * on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *."

At the Court's pretrial conference, it was stipulated that the defendant, Pan American World Airways, Inc. ("Pan Am"), has, for a number of years, followed a policy of hiring only females as flight attendants, and that plaintiff's application for employment was rejected pursuant to that policy on April 17, 1967. It was further stipulated that Pan Am's "females only" hiring policy is prohibited by Section 703(a) (1) unless being a female is, in respect of the position for which plaintiff applied, "a bona fide occupational qualification reasonably necessary to the normal operation" of Pan Am's business within the meaning of subparagraph (e) of that Section.

The stipulation left as the controlling issue to be tried the question of whether being a female was in fact such a bona fide occupational qualification for that position.[1] At the commencement of the trial, the Court ruled that Pan Am had the burden of proof on that issue. Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 235 (5th Cir. 1969). A considerable body of evidence was then offered on that subject, including a history and evaluation of the use of both male and female flight attendants on U. S. carriers for a period of over 40 years.[2]

At the close of the trial, motions for leave to file post-trial briefs as friends

1. Pan Am also put in issue the question of whether plaintiff would have been qualified for hire in the absence of its policy of hiring only females. That issue is dealt with briefly below.

2. In addition to the witnesses offered at the trial, the plaintiff's attorney was provided with (1) the transcript of an administrative hearing held on the issue by the federal Equal Employment Opportunity Commission in September, 1967 [see Air Transport Ass'n. of America v. Hernandez, 264 F.Supp. 227, modified, 55 CCH Lab.Cas. ¶ 9062 (D.D.C.1967)], which had issued its own interpretive opinion on the issue [33 Fed.Reg. 3361 (Feb. 21, 1968)], and (2) the transcripts of subsequent hearings on the same issue before the New York State Division for Human Rights. Portions of the records before both agencies were, by stipulation, made part of the record before this Court.

of the Court were filed on behalf of interested agencies and organizations: the Equal Employment Opportunity Commission ("EEOC"); the Air Transport Association of America ("ATA"), on behalf of itself and its members comprising nearly all scheduled air carriers certificated by the Civil Aeronautics Board; and the Transport Workers Union of America, AFL–CIO ("TWU"), a labor organization representing flight attendants on Pan Am and other United States air carriers. The EEOC and TWU briefs argued, as did the plaintiff's, that no bona fide occupational qualification exception could be or had been shown. The ATA brief argued in support of Pan Am's contrary position. These briefs *amicus curiae* and the briefs for the parties have proved helpful to the Court.

The Court is satisfied that the issues have had a full and fair hearing. The Court herewith confirms, pursuant to Rule 23 of the Federal Rules of Civil Procedure, its approval of the action in accordance with the pretrial stipulation of the parties as a class action in behalf of males who have applied within the United States for positions as Pan Am Flight attendants and have been rejected because of their sex. The Court likewise finds, in accordance with the party's pretrial stipulation, that the plaintiff completed the procedural and administrative prerequisites necessary to institute an action under Title VII of the Act.

## BEING A FEMALE WAS A BONA FIDE OCCUPATIONAL QUALIFICATION

Having considered the briefs, the arguments and the evidence, the Court finds that at the time of the plaintiff's application for employment as a flight attendant with Pan Am (April 1967), and at the time of trial (September 1969), being a female was a bona fide occupational qualification for hire as a flight attendant on Pan Am, and that Pan Am's policy of hiring only females for that position was accordingly not an unlawful discrimination on the grounds of sex under Section 703 of Title VII of the Civil Rights Act of 1964.[3] Since this finding is derived in part from the history of the changing functions of the position of flight attendant, corresponding to changes in the equipment, technology and operating environment of the United States airline industry, I shall summarize the pertinent facts of that history as abundantly disclosed by the evidence.

## HISTORY OF USE OF FLIGHT ATTENDANTS

Pan Am is charged with unlawful discrimination because it now hires only females as flight attendants. There is, of course, no charge that Pan Am is corporately "prejudiced" against males as employees. In fact, of its nearly 40,000 employees, four-fifths are male. Moreover, the evidence showed that at the time plaintiff was rejected for a flight attendant position in Miami on the ground that he was a male, Pan Am had other positions available to males in Miami which paid at least as well as the flight attendant position, and that if plaintiff had met all of Pan Am's qualifications other than sex for the flight attendant position, he would also have been qualified for the other positions. It further appears that Pan Am hired males as cabin attendants from the late 1920's until 1965, and was, in fact, the last major U. S. carrier to exclude males

---

3. Pan Am's flight attendants are divided by their union contract with TWU into two classes: (1) stewards and stewardesses; and (2) pursers. Pursers have supervisory functions in respect of stewards and stewardesses and a somewhat different set of duties. Initial hire has always been at the steward-stewardess level. Pursers have always been promoted from the steward-stewardess ranks. Since Pan Am does not hire pursers, the plaintiff's application was necessarily for the position of steward-stewardess. The issue presented, narrowly stated, is whether being a female is a bona fide occupational qualification for the steward-stewardess position. The Court's finding is limited to that issue.

from hire for the flight attendant position.

The plaintiff refers to Pan Am's hiring of male flight attendants at an earlier stage of its history as evidence that men can now satisfactorily perform the duties of the position. Pan Am argues, however, that its history has a deeper and less simplistic significance. It points to its prior policy of hiring men as demonstrating that its current, different policy, initially adopted with the coming of jets in 1959, is not based upon "stereotyped" thinking or "myths", as the EEOC here suggests, but is, rather, simply the latest of a series of pragmatic judgments, each a response to the changing airline operating environment, and based upon a wealth of actual operating experience. Pan Am argues that given its current equipment, route structure, passenger "mix", available personnel selection techniques, and its current definition of the "priority" functions of its flight attendants, the "females only" hiring policy will yield better over-all performance of flight attendant functions by its cabin personnel than a policy which would make both males and females eligible for the position. In this connection, the ATA emphasizes that the airline industry is characterized by continuous changes in the operating environment of its individual carrier members; that in order to maintain a high level of service to the public, each carrier should be free to define and redefine the substantive functions and objectives of its flight attendants, corresponding to particular changes in its own operating environment, to fix the level of performance desired on its airline in respect of each of those functions, and "to fix, on the basis of the employer's own experience, qualifications for the job, including a qualification as to sex, reasonably calculated to yield such performance" (ATA Brief *Amicus Curiae*, P. 6). The Court is satisfied on the basis of the evidence here that Pan Am's current hiring policy is in fact the result of just such a pragmatic process as the ATA describes, representing a judgment made upon adequate evidence acquired through Pan Am's own considerable experience, and designed to yield under Pan Am's current operating conditions better average performance for its passengers than would a policy of mixed male and female hiring.

Pan Am passenger operations began more than forty years ago with overwater flying from Miami to the Caribbean and Latin America. The trips were mostly by relatively slow seaplanes and were, consequently, long and arduous. Most passengers were men, to whom flying was still a physical adventure. Flight attendants' duties involved heavy physical labor, including mooring the aircraft at sea dockings, loading and unloading commissary equipment and baggage, and carrying back the food purchased at local marketplaces. From this period until World War II, through Pan Am's inauguration of trans-Atlantic and trans-Pacific air travel in the 1930's and the era of the "flying boats", Pan Am's flight attendants were all men.

Most U. S. domestic airlines, having different route structures from Pan Am, employing land-based equipment, and operating in a different overall environment, made a different personnel choice in the 1930's. Urged by the Government (which had been paying heavy subsidies) to make their passenger business self-supporting, they adopted a program of attracting passengers by improved in-cabin comfort and service and by reducing passenger apprehension about flying. To that end a number of carriers, including United Airlines, American Airlines, TWA and National Airlines, began in the 1930's to employ all-female cabin crews. Eastern Air Lines on the other hand, with a route structure requiring stops at a number of relatively small stations not manned by local ground personnel, was forced (like Pan Am) to assign baggage handling duties to its flight attendants, and (like Pan Am) at first employed only male stewards.

With the coming of World War II, and the rapid construction and improve-

ment of overseas airfields, Pan Am became progressively more able to use land-based aircraft. This permitted the elimination of some of the physical requirements which had dictated the earlier employment of male flight attendants. At the same time, the demands of the military services made it more difficult to find qualified males. Pan Am, accordingly, began in 1944 to add female stewardesses to its crews, and this mixed hiring pattern continued for the next 15 years, during which both stewards and stewardesses were covered by the same union contract, which placed them on a single seniority list and made no distinction in their duties.

During those 15 years, there were significant changes in Pan Am's operating environment which finally produced a change in Pan Am hiring policy in 1959. From 1944 to 1959, aircraft became faster, bigger and safer, and were capable of providing more of the amenities to passengers; flight frequency increased; the passenger "mix" changed —instead of planes filled with businessmen and military men, overseas flying attracted and was designed to attract increasing proportions of tourists, "first-time" travellers, women, children and babies. As ground facilities improved, the flight attendant's duties involving physical labor on the ground and dealings with local government authorities were gradually eliminated. These changes in turn produced a change in the in-flight needs of passengers, a shifting emphasis in the carrier-established objectives and priorities of passenger service, and a redefinition of cabin attendant functions in terms of the new objectives and priorities. The prime function of the cabin attendant, as the job was defined by Pan Am with the introduction of the jets in 1958, became to provide passengers, so far as possible, with friendly personalized service, to instill a sense of comfort and well-being in flight, and to provide maximum reassurance to the new "mix" of travellers Pan Am was carrying.

Reviewing its own experience with the thousands of male and female cabin attendants it had hired over the preceding years, Pan Am determined in 1959 that the overall level of service provided by the females it had hired was superior to that provided by the males it had hired. While the males were found capable of satisfactorily performing what Pan Am (like other airlines) describes as the "mechanical" functions of the flight attendant's job, such as the stowage of coats and the preparation and service of meals and beverages, the male stewards were found, as a group, not to be the equal of the females in the "non-mechanical" functions which had now become more important—providing reassurance to anxious passengers, giving courteous personalized service, and in general, making flights as pleasurable as possible within the limitations imposed by aircraft operations. Both sets of duties had to be performed with relatively little supervision, under conditions in which a high degree of personal motivation was required for a high level of performance. Despite its best efforts to select the most qualified and motivated individual stewards and stewardesses, Pan Am had found that of the thousands it had hired over the years, the males generally proved to be not as well qualified or motivated to perform their non-mechanical functions as the females it hired. Consequently, it found that there was a significant statistical probability that a new-hire stewardess would make a better cabin attendant than a new-hire steward.

Accordingly, Pan Am, in 1959, in order to improve the average level of service on its airline for the jet age, and on the basis of the experience just described, adopted a new hiring policy applicable to all of its operations except its Latin American Division: It determined to hire only female stewardesses.[4] The exception then made for the Latin

---

4. The males theretofore hired were not discharged, but were kept on in their jobs, their number being progressively reduced by attrition.

American Division was consistent with Pan Am's prior history. The Latin American Division was slower in relieving flight attendants of responsibilities for performance of ground duties, including the handling of customs and immigration matters, and it was slower in phasing in jet equipment. In 1965, the "females only" hiring policy became uniform throughout the Pan Am system, and was in effect in Pan Am's hiring facility in Miami in April 1967 when the plaintiff applied and was rejected for a flight attendant position.

In moving from a mixed hiring policy to one for females only, Pan Am followed the same path as the other U. S. carriers, all of whom appeared to have had the same experience in using male flight attendants. Eastern, which had hired males and females for many years, found that its stewardesses were better motivated to provide personalized service and stopped hiring men in 1958. Braniff found that the men it employed on its domestic flights did not, as a group, perform satisfactorily, and stopped hiring them in 1953.[5]

Delta had used men from 1946 to 1948 on the DC–4, but found that they did not perform as well as the females, and discontinued the hiring of men. Allegheny, Frontier, and Piedmont had each assigned baggage-handling duties to their flight attendants, and consequently used men; as those duties were eliminated, the men were replaced by women. Other airlines had comparable experiences. At the time of trial, no U. S. carrier hired males as flight attendants, except for limited situations in which the attendant had special assigned duties which were thought to be consistent with male attributes.[6]

As a result of these hiring policies on U. S. carriers, some 96% of the more than 23,000 flight attendants employed in the industry in 1967 were women, and no U. S. carrier was hiring males for the position for which the plaintiff here applied.[7]

## PASSENGER PREFERENCE

As noted above, a number of U. S. airlines have employed male as well as female flight attendants. They have, accordingly, been in a specially advantageous position to observe and evaluate passenger reaction. Two such airlines, Pan Am and Eastern, offered evidence to the Court. They each reported that on the basis of their own surveys and analyses of passenger reaction, their passengers overwhelmingly preferred to be served by female flight attendants.

Those judgments, so far as the evidence goes, were, like many management judgments, not based on carefully controlled scientific studies, but upon the daily experience and observation of knowledgeable managers. Following the passage of the Civil Rights Act of 1964, the Air Transport Association of America undertook to make a more "scientific" analysis of passenger preferences: it commissioned the Opinion Research

5. Braniff still carries male pursers on its South American routes to deal with customs and immigration problems in South American ports of call.

6. United employed Hawaiian stewards to provide local color on its Hawaiian flights, and TWA and Braniff employed males as pursers in charge of the cabin on international flights. TWA and Braniff hire only women for the steward-stewardess position for which plaintiff applied on Pan Am.

7. Evidence was offered that a number of foreign flag carriers employ male as well as female cabin attendants, although some foreign flag carriers do not employ males. It appeared that most of the foreign carriers who employ both males and females assign differing aggregates of duties to each sex, and that the male's cabin attendant job of such foreign airlines is generally not the exact equivalent of a stewardess's job on Pan Am. Moreover, it appeared that those carriers' hiring policies may be influenced by their special passenger "mix", corporate objectives, and national cultures. The fact that foreign flag airlines, operating in a different overall environment from Pan Am, may be prepared to employ males as cabin attendants does not meet Pan Am's evidence, based on its own experience with its own operating environment, as to the relative performance of male and female flight attendants.

Corporation of Princeton, New Jersey, to make an independent survey on this subject. That survey was admitted into evidence by stipulation. While the Court does not accept this survey as exact in all its particulars, the survey does tend strongly to confirm the general findings of Pan Am and Eastern that they please a much larger proportion of their passengers by limiting their hiring to females. According to the survey, 79% of the passengers surveyed, male and female, prefer being served by a female stewardess to a male steward, 18% have no preference, and 3% prefer males; among female passengers, 69% preferred stewardesses to stewards, 26% had no preference, and only 5% preferred stewards; among male passengers, 85% preferred stewardesses, 14% had no preference, and only 2% preferred stewards.[8] It has been argued to the Court that an airline may not lawfully take its passengers' preferences into account in establishing a hiring policy based on sex. That presents a question of statutory interpretation and is dealt with below. Putting aside for the moment the question of legal relevance, the Court finds as a matter of fact that Pan Am's passengers overwhelmingly prefer to be served by female stewardesses.

Pan Am sought, through a psychiatrist, Dr. Eric Berne, author of the "Structure and Dynamics of Organizations and Groups", to explain in psychological terms why, as the other evidence indicated, most airline passengers of both sexes prefer to be served by female stewardesses. There was no challenge to Dr. Berne's qualifications as an expert, and the Court found a considerable part of his testimony persuasive. Dr. Berne explained that the cabin of a modern airliner is, for passengers, a special and unique psychological environment ("sealed enclave"), characterized by the confinement of a number of people together in an enclosed and limited space, by their being subjected to the unusual physical experience of being levitated off the ground and transported through the atmosphere at high speed, by their being substantially out of touch with their accustomed world, and by their own inability to control events. That environment, said Dr. Berne, creates three typical passenger emotional states with which the air carrier must deal; first and most important, a sense of apprehension; second, a sense of boredom; and third, a feeling of excitement. Dr. Berne expressed the opinion that female stewardesses, because of the nature of their psychological relationship as females to persons of both sexes, would be better able to deal with each of these psychological states. He specially emphasized, however, that the relief of passenger anxiety, due to apprehended but non-imminent dangers, represents the most important psychological factor to be dealt with by airlines, and that females are themselves psychologically better suited for that role than males because passengers of both sexes would, in this context, respond better to the presence of females than males. He explained that many male passengers would subconsciously resent a male flight attendant perceived as more masculine than they, but respond negatively to a male flight attendant perceived as less masculine, where as male passengers would generally

8. These statistics provided by the survey relate to the passenger's overall preference in respect of the flight attendant's performance of the entire job. The survey further examined passenger preference in respect of particular portions of the flight attendant's job, and yielded, not surprisingly, varying but interesting results in respect of each separate portion. Thus, in respect of the flight attendant's efforts to relieve tension "if the flight is rough", 61% of all passengers preferred steward- esses, 15% preferred stewards, and 24% had no preference. In an actual emergency, however, only 25% would prefer stewardesses, 54% would prefer stewards, and 24% would have no preference. After a series of questions addressed to different portions of the flight attendant job, passengers were again asked to evaluate their overall preference, and again overwhelmingly expressed a preference for stewardesses.

feel themselves more masculine and thus more at ease in the presence of a young female attendant. He further explained that female passengers might consider personal overtures by male attendants as intrusive and inappropriate, while at the same time welcoming the attentions and conversation of another woman. He concluded that there are sound psychological reasons for the general preference of airline passengers for female flight attendants.

This testimony of Dr. Berne was substantially the same as testimony he had given on the same subject in a proceeding before the New York State Division for Human Rights (McNeil v. Pan American World Airways, Inc., Commission Case No. CS–12975–68) which, like his testimony before this Court, was subject to cross-examination, albeit in that case, cross-examination was by the attorney for the Commission. A copy of that testimony, admitted as an exhibit in this proceeding, was made available to the plaintiff's counsel some months in advance of the trial of this case. In the face of this notice, plaintiff failed to produce any significant evidence challenging Dr. Berne's conclusions; the plaintiff's psychologist did no more on this point than urge that Dr. Berne's view that an aircraft cabin is a special environment rests on something less than adequate data. On the basis of Dr. Berne's testimony and common sense, and on the basis of testimony by industry witnesses who described the problems of passenger apprehension, experienced over many decades, this Court finds that an airplane cabin does indeed represent a unique environment in which an air carrier is required to take account of special psychological needs of its passengers. On the record, therefore, the Court must find not only that under the conditions of modern air travel most Pan Am passengers do in fact prefer female stewardesses to male stewards, but also that there are basic psychological reasons which explain that preference.

## THE ACTUALITIES OF THE HIRING PROCESS

■ By itself, the fact that females perform better as flight attendants than do males, on the average, would by no means justify the exclusion of all males from the hiring process. If it were practicable during the course of the hiring process to select individual males who would perform at the level expected of female attendants, and whom passengers would accept as performing at as satisfactory a level, Section 703 of the Act would clearly require that selection for hire be made on an individual basis, and that males be permitted to enter the hiring process and be judged on their individual merits, even though most males might be rejected during the process. Indeed, unless it is highly impracticable to select employees on an individual basis, consistent with legitimate employment objectives, any refusal to hire males or females as a class for any particular position would violate the Act. Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 235 n. 5 (5th Cir. 1969). Recognizing this fact, Pan Am undertook to demonstrate that it is not practicable, without downgrading average flight attendant performance on its aircraft, to admit males to the hiring process.

Pan Am points to the actualities of the hiring process itself imposed by the nature of the particular employment; it hires some 1,000 new flight attendants a year; to obtain the quality of employee it desires in that number, it uses teams of interviewers, who actually interview 25,000 to 30,000 applicants a year; those interviews are not conducted in psychological testing laboratories, but in Pan Am offices across the country, on scores of college campuses and hotel suites in scores of U. S. and foreign cities, including Paris, London, Amsterdam, Stockholm, Helsinki and so on. The evidence further showed that an employee selected for hire is then given a six-week course at a training school operated by Pan Am; that it is only after the comple-

tion of the expensive training process that employees can be sent out to work "on the line", prior to which, of course, there is no opportunity to observe the employee under actual working conditions; and finally, that even after an employee has begun work "on the line", there is very little supervision, and evaluation of any given individual's level of performance is extremely difficult. The Court is satisfied that because of the special nature of the flight attendant position, air carriers are forced to rely heavily on employment selection standards, training and motivation to produce high average performance by its cabin personnel.

Pan Am offered evidence as to the personal qualifications conducive to the optimum performance of the flight attendant's function, as Pan Am currently defines it, and as to the difficulties of determining whether individual applicants have those qualities. This included testimony by its own management and by officials of Eastern and United Air Lines. It also included testimony by Dr. Raymond A. Katzell, an industrial psychologist, Chairman of the Department of Psychology of New York University, past President of the Division of Industrial Psychology of the American Psychological Association, co-author of *Testing and Fair Employment* (N.Y.U. Press 1968), and a frequent consultant to government agencies and industrial institutions in his specialty. Dr. Katzell defined that specialty as the analysis of the factors which affect the work motivation and performance level of employees, and the pursuit of methods of fixing employment qualifications which will increase the probability that the employee selected for hire will perform "at a high level", and reduce the probability "of failure or poor performance." Noting that the flight attendant's work involves not only a "mechanical" aspect but an "intangible" aspect concerned with those "interpersonal activities" which are designed to contribute to passenger comfort and a physical and psychological sense of well-being, and noting that the work was performed without supervision, Dr. Katzell stated that a high level of job performance requires not only mechanical competence but also sincere interest and motivation in providing for the comfort and ease of others in the working environment of that position. Dr. Katzell concluded that the aggregate of separate personal characteristics which would produce such interest and motivation constitute what we commonly describe as "femininity"; that while some men possess one or more of these qualities (e. g., benevolence, genuine interest in the comfort of others, lack of perceived aggressiveness) to a greater degree than some women, or even than most women, "it would be quite infrequent to find a man possessing each of these traits to at least as high a degree as the average woman"; that while it may in theory be possible to determine which individual male applicants for employment are among the few who possess the aggregate of those traits to a satisfactory level, it is not possible to make such individual determinations in any reliable way in the actual pre-employment situation with the psychological or personality testing methods now available; that the best available initial test for determining whether a particular applicant for employment is likely to have the personality characteristics conducive to high-level performance of the flight attendant's job as currently defined is consequently the applicant's biological sex; that to eliminate the female sex qualification would simply eliminate the best available tool for screening out applicants likely to be unsatisfactory and thus reduce the average level of performance.

The Court was impressed with this expert testimony and analysis, particularly since it was confirmed by the actual experience of Pan Am and Eastern that the male stewards whom they did hire, until recent years, and who therefore survived a selection process which did not exclude males, did not perform as well as the females selected in the same process. The Court further notes the Pan

Am and United testimony that those airlines have tried and abandoned previously available psychological tests as inadequate for testing the personality characteristics of applicants for the cabin attendant position, and that the industry is nevertheless continuing its efforts to find or develop suitable tests.

On the basis of this and other evidence, the Court finds that at the time of the plaintiff's application for employment and at the time of trial, there were few men who possessed the aggregate of personality characteristics which Pan Am was entitled to seek in its flight attendants; that it was not practically possible to identify in the hiring process those few men who did; that given the present requirements of the job, the admission of men to the hiring process, in the present state of the art of employment selection, would have increased the number of unsatisfactory employees hired, and reduced the average level of performance of Pan Am's flight attendants; and that the requirement that one be of the female sex was reasonably designed to improve the average performance of Pan Am's complement of flight attendants and was accordingly a bona fide occupational qualification reasonably necessary to the normal operation of Pan Am's business.

### THE STATUTE PERMITS EMPLOYMENT QUALIFICATIONS BASED ON SEX

The EEOC has suggested that findings such as this Court has made upon the evidence here does not justify Pan Am's refusal to hire males as a class, arguing that the statute requires that employment selection be made on an individual basis, and that persons of one or another sex may not be excluded as a class. (See also EEOC "Guidelines on Discrimination Because of Sex", § 1604, 30 Fed.Reg. 14926, as amended 33 Fed. Reg. 3344, 34 Fed.Reg. 13367) [9]. The

EEOC also argues that passenger preference for flight attendants of a particular sex cannot justify an airline's restriction of employment opportunities to that sex.

The EEOC is the agency charged with initial review of complaints under Title VII of the Act, and its views are entitled to deference by this Court. But the Court of Appeals for this Circuit has already indicated that where it is highly impracticable or impossible for an employer to determine bona fide qualifications for employment except on the basis of sex, as this Court has found to be the fact here, an employer may make sex a qualification for employment. Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 235 n. 5 (5th Cir. 1969). And since the Court, not the EEOC, has the final responsibility for making findings of fact and for interpreting the statute in this action under Section 706, which must be tried here *de novo*, the Court cannot in justice accept the EEOC's interpretation which it finds to be inconsistent with the statutory language and the legislative history. The Court believes that the "bona fide occupational qualification" exception made by Section 703 for religion, sex, or national origin (but not for race or color) was consciously and deliberately intended by Congress to permit employers to establish general job qualifications based on one or more of those factors—and not necessarily related to basic job skills—in the very limited circumstances defined by subparagraph (e) of that Section. This was made very clear by Senators Clark and Case, the floor managers for the Civil Rights Bill in the Senate, in their formal "Interpretive Memorandum" submitted to the Senate during the debate,[10] which explained the exception as follows:

" * * * [The Section] creates certain limited exceptions from these pro-

---

9. Title VII does not give the EEOC general authority to issue substantive regulations.

10. There was no Committee report in the Senate, the bill having been referred directly to the Senate floor after passage by the House.

hibitions [of section 703]. First, it would not be an unlawful employment practice to hire or employ employees of a particular religion, sex, or national origin in those situations where religion, sex, or national origin is a bona fide occupational qualification for the job. *This exception must not be confused with the right which all employers would have to hire and fire on the basis of general qualifications for the job, such as skill or intelligence.* This exception is a limited right to discriminate on the basis of religion, sex or national origin where the reason for the discrimination is a bona fide occupational qualification. Examples of such legitimate discrimination would be the preference of a French restaurant for a French cook, the preference of a professional baseball team for male players, and the preference of a business which seeks the patronage of members of particular religious groups for a salesman of that religion \* \* \*" (110 Cong. Rec. 7213; emphasis supplied).

The clear import of this legislative history is that customer preference can provide a basis for an employer's selecting employees on the basis of their sex where the preference is a legitimate one, related to differences in the ways in which the work will be performed by persons of different sexes, and the manner in which such performance will be received by the customer because of such differences. It is suggested that such recognition of customer preference on grounds of sex will open the door to legitimatizing discrimination on grounds of race or color on the excuse of customer prejudice or preference. The short answer to this objection is that Congress has indicated that customer preference may be considered under the limited "bona fide occupational qualification" exception to the general prohibition against discrimination on grounds of sex, but that Congress did not include any such exception to its general prohibition against discrimination on grounds of race or color. Indeed, it would be constitutionally impermissible to recognize any employment qualification based on race or color. Colorado Anti-Discrimination Comm. v. Continental Airlines, 372 U.S. 714, 721, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963).

## CONCLUSION

In view of all the foregoing, this Court concludes that defendant Pan Am's policy of hiring only females for the flight attendant position was not an unlawful discrimination on the grounds of sex under Section 703 of Title VII of the Civil Rights Act of 1964.

The Court further finds and concludes that plaintiff was not individually qualified for the position of Pan Am flight attendant, apart from his sex. Pan Am's general age qualification for hire for the position in April, 1967 was 26 years of age; the plaintiff was 30. Although Pan Am sometimes waived its hiring age requirements in cases where applicants possessed outstanding qualifications in other areas, it does not appear that plaintiff was thus specially favored. The plaintiff's lack of personal qualifications for the position does not, however, affect his standing to maintain this action as a class action for an injunction. However, since the class action has no merit, it must be dismissed.

This Memorandum Opinion shall serve in lieu of separate findings of fact and conclusions of law in this case. Counsel for Pan Am are hereby directed to submit an appropriate form of judgment in conformity with this Memorandum Opinion within ten (10) days of the date of entry hereof.