**Margaret M. MAGUIRE et al.,
Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC.,
et al., Defendants.**

**No. 70 Civ. 3947.**

United States District Court,
S. D. New York.

Nov. 5, 1975.

Kleiman, Cornfield & Feldman, Gilbert Feldman, Barbara J. Hillman, Chicago, Ill., for Maguire.

Poletti Freidin Prashker Feldman & Gartner, Herbert Prashker, Peyton H. Moss, New York City, for TWA.

O'Donnell & Schwartz, Asher W. Schwartz, Renee Rivkis, Malcolm A. Goldstein, New York City, for TWU, Local 551 and Alssa.

WYATT, District Judge.

This is a motion by defendant Trans World Airlines, Inc. (TWA) for partial summary judgment dismissing all claims in the second amended complaint which are asserted under Title VII of the Civil Rights Act of 1964 (78 Stat. 253 and following; "the 1964 Act"). The ground for the motion is lack of jurisdiction over the subject matter because the action was not commenced within the 30 day period specified in the statute as enacted and as in effect at the relevant time (78 Stat. 260).

The action was commenced on September 10, 1970, by plaintiff Maguire and eleven other female employees of TWA. ▮ The trial of the action commenced to the Court without a jury on September 16, 1975; the trial is presently in recess until February 16, 1976 because of the necessity for the Court to deal with other matters. The present motion was made returnable at the opening of trial. It was of some interest that the motion had not been made earlier by TWA; the explanations for movant are not entirely satisfying but in any event the issue is one of jurisdiction which, of course, can be raised at any time and should be raised by the Court if the parties do not do so.

The motion raises a serious issue of jurisdiction which must be set in the factual background of the litigation.

1.

TWA is an airline with domestic operations and international operations. On international operations there is a purser and there are also other cabin employees. Before August 8, 1967, all pursers had been male and all other cabin employees had been female, then called "hostesses". Pursers and hostesses were sometimes together called "cabin attendants". Pursers are paid more than other cabin attendants.

On domestic operations there were only hostesses; there were no pursers.

Hostesses on international flights were paid more than hostesses on domestic flights.

Alssa was the Air Line Stewards and Stewardesses Association, Local 550 and was part of Transport Workers Union of America (TWU). Alssa was the representative for *both* hostesses and pursers for collective bargaining under the Railway Labor Act. Alssa, Local 550 (Alssa, for short), represented cabin personnel (flight attendants), male and female, on several airlines, including TWA; its headquarters offices were in Chicago. There were local executive councils of Alssa at each TWA base, sometimes called the "domicile" of the flight attendants working from that base.

On August 8, 1967, Alssa and TWA made an agreement.

By the agreement (Article 13(G)), hostesses (females) were made eligible to be pursers and were given preference for vacancies in the purser position. There were separate seniority lists, one for hostesses and one for pursers.

The August 8, 1967, agreement was to be in effect until July 31, 1969.

This action grew out of claims by Maguire and other hostesses on international flights that TWA discriminated against females, principally in that hostesses (females) were paid less than pursers (mostly male) for substantially the same work; in that hostesses (female) were denied promotion to purser because of language requirements not applicable to male pursers; and in that there were separate seniority lists, one for hostesses (female) and another for pursers (mostly male).

The union (Alssa) represented both hostesses (female) and pursers (mostly male) and there was some tension between the interests of the two sexes.

Maguire has been active for a long time in union affairs. She was a local executive chairman in Boston in 1958 (SM 768–70) and 1959. She then transferred to international flights as a hostess and was based in New York.

In early 1968, Maguire tried to become a purser but failed the language test.

On April 26, 1968, Maguire filed a charge with the Equal Employment Opportunity Commission (EEOC) against both TWA and the union Alssa. This is the charge on which the 1964 Act claims in this action are based.

In 1968, Maguire, Pearl Nelson and others began circulating a petition, composed by Maguire and Nelson, for signature by union members. This petition —usually called the "equal pay for equal work" petition—was designed for presentation to the union for use as union proposals in the negotiations with TWA for a contract to replace that expiring July 31, 1969.

In 1968, Maguire ran for a position in the union at the New York base—using the petition as campaign material—but was defeated by a male purser.

The union contract negotiations with TWA began in June 1969. Apparently the old August 8, 1967, agreement continued in effect during the negotiations (which lasted, as will be seen, until October 22, 1970).

In June 1969, Nelson was elected chairman of the union council at New York and shortly afterwards she became one of the union negotiators in the contract discussions with TWA.

### 2.

EEOC on March 17, 1970, filed its decision on the Maguire charge. The decision was that reasonable cause existed to believe that the union and TWA were "jointly and severally" engaged in violations of the 1964 Act. See Section 706(a) of that Act (78 Stat. 259). After such a determination, the 1964 Act specifies what should be done: "the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion" (78 Stat. 259). This was the only power of EEOC under the 1964 Act as enacted.

### 3.

The chronological narration must be interrupted to examine the 1964 Act as to civil actions and EEOC practices in respect of the statutory notice after which, during a 30 day period, a civil action may be brought by the person aggrieved against the respondents named in the charge.

Section 706(e) of the 1964 Act as enacted and in effect in 1970 read, in pertinent part, as follows:

"(e) If within thirty days after a charge is filed with the Commission . . . (except that . . . such period may be extended to not more than sixty days upon a determination by the Commission that further efforts to secure voluntary compliance

are warranted) the Commission *has been unable to obtain voluntary compliance with this title,* the Commission shall so notify the person aggrieved and a civil action may, *within thirty days thereafter,* be brought against the respondent named in the charge (1) by the person claiming to be aggrieved, . . . ." (emphasis supplied)

It should be emphasized that the notice which starts the 30 day period running is, according to the statute, notice that "the Commission has been unable to obtain voluntary compliance". There is nothing in the statute about any notice to the person aggrieved of his or her right to sue.

According to the statute as passed, if EEOC is unable to obtain voluntary compliance by respondents within a maximum of 60 days after the charge is filed, it "shall so notify the person aggrieved" and a civil action may be commenced within 30 days.

This gave EEOC only 60 days at best to investigate, determine reasonable cause, and attempt conciliation. The large number of charges filed apparently made it impossible for EEOC to complete its duties in that period. Its regulations had early extended to 60 days the "time for processing all cases" (C.F.R. § 1601.25a(a) in effect when the Maguire charge was filed). The statute had put the period at 30 days, after which the statutory notice was required to be given; the EEOC could extend this period to as long as 60 days in any given case "upon a determination by the Commission that further efforts to secure voluntary compliance are warranted" (78 Stat. 260). Without any such determination, the EEOC regulations (of questionable validity) made a blanket extension to 60 days in all cases.

The EEOC must have realized that even within the 60 day period after which the statutory notice was required, it could not attempt conciliation in the many cases before it. A procedure (of questionable validity), expressed in reg-

ulations, was therefore devised which on its face enabled EEOC to delay giving the statutory notice ("unable to obtain voluntary compliance") unless such a notice was demanded. The regulations (from 29 C.F.R.) read in pertinent part as follows:

"PROCEDURE AFTER FAILURE OF CONCILIATION

§ 1601.25 Notice to respondent and aggrieved person.

In any instance in which the Commission is unable to obtain voluntary compliance as provided by Title VII it shall so notify the respondent and the aggrieved person or persons. Notification to an aggrieved person shall include:

(a) A copy of the charge.

(b) A copy of the Commission's determination of reasonable cause.

(c) Advice concerning his right to proceed in court under section 706(e) of Title VII.

§ 1601.25a Processing of cases; when notice issues under § 1601.-25.

(a) The time for processing all cases is extended to sixty (60) days

. . .

(b) Notwithstanding the provisions of paragraph (a) of this section the Commission shall not issue a notice pursuant to § 1601.25 . . . . where reasonable cause has been found, prior to efforts at conciliation with respondent, except as provided in paragraph (c) of this section.

(c) At any time after the expiration of sixty (60) days from the date of the filing of a charge, or upon dismissal of the charge at any stage of the proceedings, . . . the charging party or the respondent may demand in writing that a notice issue pursuant to § 1601.25, and the Commission shall promptly issue such notice, with copies to all parties."

It must be noted that by these regulations notice to the aggrieved person in-

cludes "advice concerning his right to proceed in court" but this was invented and added by EEOC and is *not* found in the statute. While the addition may be an appropriate act, it has no legal effect on the rights of the person aggrieved, either as to the period for commencement of a civil action or otherwise.

Thus, looking backward, it may be seen what the situation was after Maguire filed her charges with EEOC on April 26, 1968.

Under Section 706(b) of the 1964 Act (78 Stat. 259–60) an aggrieved person is required to go first to a state agency where one is available. If, however, a charge is filed with EEOC without having been submitted to an available state agency, EEOC does not dismiss the charge but refers it to the state agency and, after termination of the state proceedings, considers the charge as then filed with EEOC (29 C.F.R. § 1601.12). This procedure seems valid and reasonable.

Maguire had not started any proceeding before any New York agency. When her charge was filed with EEOC on April 26, 1968, it was referred to the New York State Commission for Human Rights which dismissed the charge on jurisdictional grounds on May 15, 1968. EEOC assumed jurisdiction on May 16, 1968. Thus, May 16, 1968 is the date when Maguire's charge was "filed" with EEOC within the meaning of Section 706(e) of the 1964 Act (78 Stat. 260).

Thirty days after May 16, 1968, was June 15, 1968, which was a Saturday. The following Monday was June 17, 1968.

Sixty days after May 16, 1968, was July 15, 1968.

Assuming (without deciding) that the blanket extension of EEOC to 60 days was valid, then the statute (Section 706(e)) directed EEOC on July 15, 1968, to notify Maguire that it had been "unable to obtain voluntary compliance". She then could have commenced an action within 30 days after receipt of such notice. EEOC did not give any such notice until—as will be seen—nearly two years later.

Under EEOC regulations quoted above, at all times since July 15, 1968, Maguire or the union or TWA could have demanded that EEOC issue notice that it had been "unable to obtain voluntary compliance" and EEOC was bound to issue such notice "promptly". This would have started the 30 day period running within which Maguire could commence an action. Neither Maguire nor the union nor TWA made any such demand.

**4.**

As noted above, EEOC filed its decision on the Maguire charge on March 17, 1970. This found reasonable cause, etc.

Under date of April 9, 1970, EEOC notified Maguire, the union, and TWA of its decision and that it would, through Mr. Wank, attempt conciliation. EEOC also notified the union and TWA that if it is unsuccessful in securing voluntary compliance, "we must so notify the charging Party and advise her of her right to seek relief in a Federal Court . . . .".

Maguire says that she received the EEOC notice on April 14 and then called TWA (Cromartie) to ask TWA's position on the EEOC decision; Cromartie told her that TWA would wait on the result of a suit being prosecuted by Diaz against Pan American. Maguire thus knew on April 14 that TWA would not voluntarily comply with the EEOC decision but would wait to the end of the Diaz-Pan Am litigation.

The union responded to the EEOC April 9 notice under date of April 13, advising that Mr. Horst of TWU in New York was "the party to be contacted in this matter".

TWA (Ostergard) telephoned Wank on April 14 and explained that he would be writing to explain TWA's position on conciliation because of the Sprogis, Diaz, and Lansdale cases.

Maguire telephoned Wank on April 15. Wank told her (what she already knew) that there were claims against other airlines in litigation and that TWA would wait to the end of these suits before complying with the EEOC decision. Maguire says (Sept. 27, 1975 affidavit) that she told him this would take "years" but that he told her that if TWA did not comply "EEOC could send me a right to sue letter and after I received such right to sue letter I could then sue TWA." Wank's notes show that after this explanation Maguire said she would consider a lawsuit against TWA and "will get back to me after she decides what to do about suit at this time". Thus on April 15, 1970, Maguire knew that there would be no "voluntary compliance" by TWA (because of the pending suits against other airlines), and had been told that EEOC could send her a letter stating this, and that she could then sue TWA.

Under date of April 30, TWA wrote EEOC (Wank) that it was "not . . . inclined to discuss conciliation" until after the end of the Lansdale and Diaz cases, that the "appellate status" of those cases was "unknown" and that the EEOC decision was in conflict with the court decisions in those cases.

EEOC thus knew, as soon as it received the TWA letter of April 30, that it could not obtain "voluntary compliance" by TWA.

#### 5.

The reasons for TWA's attitude are easy to discover. At the time it received the April 9, 1970, notice from EEOC there had been at least three recent and significant decisions involving sex, the airlines, and the 1964 Act.

On December 2, 1969, a civil action was dismissed in which a female cabin attendant sued under the 1964 Act because she had been discharged for marrying whereas male cabin attendants were allowed to marry. *Lansdale v. Air Line Pilots Association,* 2 EPD 710 (S.D.Fla.)

On January 21, 1970, a result opposite to that in *Lansdale* was reached in another court where it was held a violation of the 1964 Act for an airline to discharge a female cabin attendant for marrying while permitting male cabin attendants to marry. *Sprogis v. United Air Lines,* 308 F.Supp. 959 (N.D.Ill.)

On April 8, 1970, it was held that, under Section 703(e) of the 1964 Act, being a female was a "bona fide occupational qualification" for the job of cabin flight atendant. Diaz, a male, had sued Pan Am because it had a policy of hiring only females as cabin flight attendants. His action was dismissed. *Diaz v. Pan American etc.,* 311 F.Supp. 559 (S.D.Fla.)

Thus when TWA was faced with the EEOC Maguire decision in April 1970, there were three significant District Court decisions, two of which reached contrary results, and the outcome of all on appeal was uncertain. There were grave doubts as to what the position of the airlines was under the 1964 Act with respect to male and female flight attendants. It was obvious that "voluntary compliance" by TWA was not a possibility.

While not affecting the issues here, for completeness the later history of the three decisions discussed should be noted.

In *Lansdale,* the District Court decision was reversed on August 13, 1970. 430 F.2d 1341 (5th Cir.).

In *Sprogis,* the District Court decision was affirmed by a 2–1 vote on June 16, 1971. 444 F.2d 1194 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L. Ed.2d 543 (1971).

In Diaz, the District Court decision was reversed on April 6, 1971. 442 F.2d 385 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).

#### 6.

The "Conciliations Division" of EEOC (apparently in its Washington office) reviewed the April 30 TWA letter and

promptly and correctly concluded that "voluntary compliance" would not be obtained from TWA. Therefore, under date of May 8, 1970, (a Friday) Wank (in the New York Regional office) was advised that EEOC had "determined that Charging Party should be sent a Right to Sue letter and the case processed as an unsuccessful conciliation effort". Wank received this determination on Monday, May 11, and thus on that date was under a duty to send notice to Maguire that EEOC had been "unable to obtain voluntary compliance". He did not do so.

Meanwhile the union had retained Gilbert Feldman, Esq., a Chicago lawyer, to act for it in connection with the Maguire charge.

Feldman had acted as attorney for the union in the past. Since about 1965, the union had engaged Feldman from time to time to handle on its behalf special matters, including EEOC matters. In April 1970, Feldman acted as attorney for the union in an arbitration matter with TWA; Feldman employed Maguire as an expert witness in that matter.

Under date of May 15, Wank wrote Maguire asking her to call him. She did so on May 18. Wank told her that the EEOC Washington office had sent back the file with instructions to send out a notice of right to sue and "to close out as unsuccessful conciliation". Thus on May 18, 1970, Maguire was notified by EEOC in substance that it had been "unable to obtain voluntary compliance". This is the notice which, under the statute, starts the running of the 30 day period within which an action may be brought by the aggrieved party. It is notice that administrative remedies are exhausted and that if the charge is to be pursued it must be by a civil action in a district court within 30 days. Apparently EEOC had determined that *it* would attempt to control the start of the running of the 30 day period by the timing of a "right to sue" letter, this despite the fact that no such letter is mentioned in the statute. In any event, Wank talked to Maguire on May 18 about her getting a lawyer and according to his notes at the time "pending same, will hold up N/R to sue". According to Maguire's latest affidavit, Wank told her that "I would not have to bring suit until thirty (30) days after I received the right to sue letter from the EEOC" and that he "would hold it up for me until I was ready". If Wank in fact said this, then he, an employee of EEOC, was purporting to extend permission to the aggrieved person herself to determine when she was "ready" to bring the action required by Congress to be brought within 30 days of notice that EEOC administrative remedies were exhausted.

Maguire and the union were now drawing closer together. In 1969 she had become vice chairman of the union local executive council at New York (Nelson was chairman). Now in May 1970 Maguire became secretary of Alssa itself.* She was, of course, in frequent touch with the other union officials and with Feldman, the union lawyer.

The union and Maguire at this point were under some obvious pressures to devise a common strategy.

Maguire was evidently determined to sue TWA under the 1964 Act and logically should have been equally determined to sue the union, the other respondent named in her charge to EEOC; reasonable cause had been found by EEOC to believe that the union, equally with TWA, had violated the 1964 Act. Maguire, however, was now close to the union. Moreover, she needed a lawyer to bring her action and support from the union in this and in other respects would be welcome.

For its part, the union was exposed, equally with TWA, to a civil action by Maguire under the 1964 Act.

---

* She served as such until May 1972 and served thereafter until May 1974 as treasurer of the union.

Both Maguire and the union were interested in the then continuing negotiations with TWA for a new contract. There was a common concern that the commencement of an action by Maguire should not adversely affect these negotiations. There was a common desire that commencement of the action be delayed so that its effect would be minimized.

The strategy devised was that Maguire should retain the union's lawyer to represent her, that she should sue TWA but not the union and that the sanction and authority of Wank (EEOC) should be secured. It seems to have been supposed (mistakenly, in my view) that by manipulating the time of a notice to the aggrieved person of the right to sue, EEOC could control the time within which a civil action could be commenced —despite the fact that there is nothing in the statute about any notice of a right to sue. Maguire and the union evidently wished to delay commencement of the action until, in the light of the negotiations with TWA, the time was believed to be ripe.

Under date of May 27, Feldman, ostensibly as attorney for the union, wrote to Wank that the union was interested in conciliation, that it supported Maguire's claims and the EEOC decision and that if TWA did not respond to "conciliation efforts" then the union was interested in "causing" an action to be commenced "as quickly as possible to enforce the claim filed by Miss Maguire". A copy of this letter was sent to Maguire. Feldman of course knew at this time that "conciliation efforts" were useless in the circumstances (Feldman, in fact, had appeared for the union Alssa as amicus curiae, in the *Diaz* action against Pan American). While Feldman wrote about how "quickly" the union wanted an action commenced, it is evident that neither the union nor Maguire wanted an action commenced until it could be done with the least damage to the then negotiations. It also seems evident that by this time Feldman had been

engaged to act for Maguire·as well as the union and that it had been decided that the action to be commenced by Maguire would be against TWA only and *not* against the union. Indeed, it would seem impossible as a practical matter for Maguire to have sued the union: she was herself a union official and she had engaged as her lawyer the union lawyer who was acting for the union in the claims made by her against the union and TWA.

As soon as he received Feldman's May 27 letter, Wank told Feldman by telephone (what Feldman undoubtedly already knew) that TWA would not discuss conciliation until the *Diaz* and other airlines litigation had been concluded.

Under date of June 4, 1970, Wank wrote to Feldman that "we have terminated our effort to conciliate this matter". The June 4 letter was sent by certified mail return receipt requested, not only to Feldman but to Maguire, to the president of the union, and to TWA. The June 4 letter must have been understood by all concerned to be formal notice under the statute that EEOC had been "unable to obtain voluntary compliance". No other such notice has ever been given by EEOC and if the commencement of Maguire's action is authorized by the statute, it can only be in virtue of the June 4, 1970 notice.

It does not appear on exactly what date Maguire received the June 4 notice letter. She acknowledged under oath that she did receive a copy of it (deposition SM 391–92). Her copy was mailed in New York City to her in New York City and she must have received it on June 5 or 6.

On June 12 Maguire wrote to EEOC (Wank) advising that Feldman was her lawyer and that "the Notice of Right to Sue" should be mailed to him (her letter was written on Alssa stationery, she then being secretary of the union).

Since Maguire had already received the *statutory* notice (that is, that EEOC "has been unable to obtain voluntary compliance") by (at latest) June 12,

1970, the statutory 30-day period for the commencement of her action began to run, at latest, on June 12, 1970.

Feldman received a copy of Maguire's June 12 letter to EEOC about mailing him a "Notice of Right to Sue". At once, under date of June 15, Feldman wrote to EEOC that he "would appreciate your holding that Notice up for 30 days". EEOC held up the sending of its Notice of a right to sue.

### 7.

It may be noted that, under an agreement with Maguire, EEOC had already been holding up the sending of its right to sue letter. This agreement with Maguire is specifically referred to as an "understanding" in the EEOC June 4 letter.

A major, if not the only, reason for deferring commencement of the civil action was fear by the union and Maguire of the effect of such action on the continuing contract negotiations between the union and TWA. Maguire testified by deposition as to this (SM 394/395–396):

"Q  Didn't you ask the EEOC to hold up the right to sue letter so as to provide time for Local 550 and the Trans World Airlines to resolve the major questions you were raising by your EEOC claim?

A  Well, I was worried about the impact of this lawsuit on the negotiations, and I was not sure of what to do at that time; so I asked the EEOC to hold it up because we should be getting a contract pretty soon. We had been at it so long.

Q  Didn't you ask the EEOC to hold up the right to sue letter in order to permit the issue of hostess seniority being credited to female pursers who were promoted from hostess to purser positions being settled in the contract negotiations?

A  Well, I was hoping that that would be settled in the contract negotiations.

Q  Is that why you asked the EEOC to hold up sending you the right to sue letter?

A  Yes, I felt there would be changes in that contract that would be significant to our lawsuit.

Q  So you held up the right to sue letter in order to permit TWA and Local 550 to resolve issues raised by your EEOC charge, which were then pending in contract negotiations?

A  Yes, as much as possible."

By July 6, 1970, the union and Maguire evidently believed that the state of the contract negotiations would permit her action to be commenced. Under date of July 6, 1970, Feldman wrote to EEOC asking that EEOC "release order to the undersigned so that suit can be instituted". For some reason—possibly because it was the vacation period— EEOC did not respond at once.

Under date of August 17, 1970, EEOC sent Maguire a one page document headed "Notice of Right to Sue Within 30 Days". When exactly Maguire received this notice does not appear, but for present purposes it is assumed that she received it on August 20, 1970 (the date of receipt averred in her complaint in this action as subsequently filed).

The August 17, 1970 notice purports to be "pursuant to Section 706(e)" of the 1964 Act but on its face is no such thing. It does *not* contain, either in words or in substance, the *only* notice required by the 1964 Act, namely, that EEOC has been "unable to obtain voluntary compliance". No such notice was given, obviously for the reason that EEOC correctly believed that such notice had *already* been given by the June 4, 1970, statement that "we have terminated our effort to conciliate this matter".

The August 17, 1970, notice was simply that Maguire had 30 days of "receipt of this communication" within which to commence a civil action. There is no provision for any such notice in the statute and, as a matter of law, the time

within which Maguire might have commenced her action had expired *before* the EEOC notice of August 17, 1970, was sent.

### 9.

This action was commenced on September 10, 1970, within thirty days of the receipt by Maguire from EEOC of the "notice of right to sue". The complaint as filed contained this averment:

> "On August 20, 1970, Plaintiff Maguire was advised that the EEOC had not accomplished the compliance of defendant with its obligations under Title VII of the Civil Rights Act and that she was entitled to institute a civil action in the appropriate Federal District Court within 30 days of receipt of such letter."

This averment, referring as it does to the August 17, 1970 notice, is inaccurate. As has been seen, that notice is *not* that "EEOC had not accomplished the compliance of TWA with its obligations under Title VII of the Civil Rights Act". The August 17, 1970, notice is purely and simply a notice of a right to sue within 30 days. In order to maintain this action, plaintiff Maguire is obliged to rely on the June 4, 1970, notice as the statutory jurisdictional prerequisite.

### 10.

The 30 day period within which Maguire could commence her action expired at latest on July 13, 1970. This is 30 days after (at latest) her receipt of the statutory notice that EEOC "has been unable to obtain voluntary compliance".

An action commenced more than 30 days after receipt of such notice is not within the jurisdiction of this Court. *Genovese v. Shell Oil Co.*, 488 F.2d 84 (5th Cir. 1973); *Cunningham v. Litton Industries*, 413 F.2d 887 (9th Cir. 1969); *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357 (7th Cir. 1968). These decisions make it plain that the notice which starts the jurisdictional period running is simply notice that EEOC "has been unable to obtain voluntary compliance". In each of the cited cases, however, there appears to have been included with such notice an advice that suit must be commenced within 30 days.

The only decision which has been found where on the facts EEOC gave no notice of the 30 day period for suit is *Hicks v. Crown Zellerbach Corp.*, 319 F. Supp. 314, 316 n.5 (E.D.La.1970). The notice from EEOC was merely that required by the statute, namely, that "the Commission had not been successful in securing voluntary compliance". Apparently EEOC made no reference to the 30 day period for suit. The decision was that such notice satisfied the jurisdictional requirement of the 1964 Act as enacted, and this seems clearly correct.

This action, having been commenced after expiration of the time period prescribed by Congress, is not within the jurisdiction of this Court.

### 11.

Since this Court seems so plainly to lack jurisdiction, it is puzzling why TWA never raised the point until so late in the litigation. No satisfactory explanation has been given.

The statute is not ambiguous; on its face the time limitation is crystal clear.

It may be that counsel for TWA, and possibly also counsel for the union and Maguire, were bemused by the acts of EEOC in taking unto itself the control of the time for the commencement of civil actions. Counsel may well have hesitated to challenge the assumption of this control by EEOC.

It may also be that TWA, in the light of contract negotiations with the union and of its employee relations, may have preferred for the action to lie dormant for several years (as in fact it did, until revived by the adoption of the individual assignment system and transfer of the action within this Court).

Such speculations may be interesting but need not be pursued because jurisdiction cannot be conferred on a

federal Court by consent and even if never raised by a party must be noticed by the Court on its own motion. This is familiar law, but a classic illustration may be cited. *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 17–18, 71 S.Ct. 534, 95 L.Ed. 702 (1951)

### 12.

In considering decided cases, care must be taken to distinguish between (a) those dealing with the 1964 Act as enacted and (b) those dealing with the 1964 Act as amended in 1972.

As enacted, the 1964 Act gave EEOC the power to achieve the purposes of the Act *only* through "informal methods of conference, conciliation, and persuasion" (78 Stat. 259). If EEOC could not secure "voluntary compliance", then notice of that fact terminated administrative remedies and started the 30 day period running for commencement of a private civil action.

The 1972 amendments to the 1964 Act were effective with respect to charges pending with EEOC on March 24, 1972 (the date of enactment of the amendments) and with respect to all charges thereafter filed.

The 1972 amendments gave EEOC for the first time the power to bring a civil action against a private (nongovernmental) employer or a union respondent. The 1972 amendments also added the concept of a "conciliation agreement" as the end result of a successful effort to secure voluntary compliance. Thus, the 1972 amendments *added* administrative remedies. The effect of the 1972 amendments is discussed in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) and in *Tuft v. McDonnell Douglas Corp.,* 517 F.2d 1301, 1305–06 (8th Cir. 1975).

By reason of the added administrative remedies, the content of the notice to the aggrieved person of the exhaustion of administrative remedies—that which began the running of the time period for commencing an action—had to be, and was, changed in the 1972 amend-ments (the length of the time period was also increased). The notice provision after the 1972 amendments was in relevant part as follows (42 U.S.C. § 2000e–5(f)(1)):

". . . if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action under this section . . ., or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved . . . .".

*After* the 1972 amendments, therefore, the notice which starts the time period (ninety days) for a private civil action running is notice (a) that EEOC has not filed a civil action and (b) that EEOC has not entered into a conciliation agreement to which the person aggrieved is a party.

### 13.

Consideration has been given to *Tuft v. McDonnell,* above cited, but it is plainly distinguishable. The case arose *after* the 1972 amendments. A first letter from EEOC that conciliation had failed was held not to start the time period running because such letter "does not mention suit consideration by the Commission" (517 F.2d at 1309). This seems entirely correct but wholly inapplicable to the case at bar which arose *before* the 1972 amendments, when the Commission had no power to bring a suit.

### 14.

The most important prior decision for the present issue is *De Matteis v. Eastman Kodak Co.,* 511 F.2d 306 (2d Cir. 1975), on rehearing, 520 F.2d 409 (1975).

There are many differences, however, between the case at bar and the *De Matteis* case ("DM" for short), among them (a) that DM was governed by the 1964 Act *as amended* effective March 24, 1972, and (b) that the charge in DM was dismissed by EEOC on a determination that there was no reasonable cause to believe that the charge was true.

De Matteis filed his charge with EEOC on February 26, 1972 (but it was *pending* before EEOC on March 24, 1972, and the amendments then effective are applicable (86 Stat. at 113)).

On May 7, 1973, EEOC determined that there was no reasonable cause to believe that the charge of De Matteis against Kodak was true and dismissed that charge. On May 8, 1973, EEOC sent a letter to De Matteis and, according to the first opinion in DM on February 6, 1975, advised him that it had dismissed his charge and that he had a statutory right to institute a civil action (511 F.2d at 308 n.3).

After he received the May 8, 1973 notice, De Matteis retained counsel within the 90 day statutory period from that date for the commencement of a civil action. Counsel did not commence an action within that period, however, apparently believing that EEOC regulations required that a notice of right to sue be obtained from EEOC.

Demand was made by counsel for notice of a right to sue and on July 26, 1973, such notice was received from EEOC. Within the statutory time period calculated from July 26, 1973 (90 days, after the 1972 amendments), De Matteis commenced his action on October 3, 1973.

The Court of Appeals on February 6, 1975, held that commencement of the action within the time period prescribed by statute was jurisdictional, that this period began to run from May 8, 1973, when De Matteis received notice of the dismissal of his charge, that the later notice of right to sue was "irrelevant" (511 F.2d at 309), that notice of a right to sue was "invented" by EEOC (511 F.

2d at 310), that the statute required EEOC to give the specific kind of notice prescribed, that the statute did not prescribe any notice of a right to sue, that the EEOC regulations allowing the aggrieved person to demand notice of a right to sue would extend "indefinitely" the limitation period for commencing a civil action, that EEOC "has no such regulatory power", that an "administrative agency" cannot "extend the jurisdiction of the district court", and that the EEOC regulations "should be declared invalid" (511 F.2d at 311).

The decision and opinion of the Court of Appeals in DM as filed on February 6, 1975, would require that all claims in this action under the 1964 Act be dismissed as untimely brought.

There was, however, a later decision and opinion in DM on rehearing by the Court of Appeals.

### 15.

On February 27, 1975, De Matteis filed a petition for rehearing based on mistaken assumptions by the Court of Appeals as to the facts. De Matteis pointed out that the May 8, 1973, notice to him by EEOC was not as described in the Court's opinion, that it did not notify him that his charge had been dismissed, and that it did not notify him that he had a right to commence an action but rather that he had a right to request in writing that EEOC "issue a Notice of Right to Sue authorizing you to institute a civil action . . . .".

The Court of Appeals then on July 30, 1975, filed an opinion on rehearing which modified its judgment. The modification is that its decision—that notice of dismissal by EEOC of a charge begins the running of the statutory period for the commencement of a civil action rather than a later notice of a right to sue—"will have prospective effect only". The Court explained that this meant that its decision "will first apply to actions, wherein appellants or applicants have been misled by the Commission,

brought under § 706 of Title VII on and after May 7, 1975".

It is irrelevant whether or not I agree with this modification by the Court of Appeals of its judgment in the DM case. My duty is to follow the principles laid down by the Court of Appeals if they are applicable to the case at bar.

The hard question is whether the final result in the DM case controls the case at bar.

### 16.

It is concluded that the opinion on rehearing in DM does not control the case at bar.

In DM, the Court was dealing with an action brought *after* the effective date of the 1972 amendments to the 1964 Act. The case at bar was brought *before* the effective date of those amendments.

In DM, there was a dismissal by EEOC of the charge under Section 706(b) of the 1964 Act as amended. It was thereupon the duty of EEOC to "promptly notify the person claiming to be aggrieved and the respondent of its action". Section 706(f)(1) of the 1964 Act as amended provides that a civil action may be brought "within ninety days after the giving of such notice". The Court of Appeals apparently found that there had been such notice of dismissal; in the EEOC letter of May 8, 1973 to De Matteis such a notice was not explicit. In any event, in the case at bar, there was no dismissal of the charge by EEOC and the notice which began the running of the statutory time period was notice that EEOC "has been unable to obtain voluntary compliance".

In DM, the notice to the aggrieved person stated that he had a right to request in writing that EEOC authorize him to institute a civil action. There was no such statement in any notice in the case at bar.

In DM, the Court of Appeals found that it would be "inequitable" under the "circumstances" there present "to bar the claim of a party who filed suit within the period recommended by the administrative body which had been established to help vindicate such statutory rights". The "circumstances" here are different and while it is difficult to predict with confidence that the Court of Appeals would feel that the result should be different, such seems the more reasonable prediction.

In the case at bar, Maguire was advised by counsel, was close to the union, had the benefit of its experience, and knew all the facts. The statute, as it applied to Maguire, was perfectly clear. The statute made no mention of any notice of a right to sue. Maguire, the union, their counsel, and EEOC must have known that the time for commencement of a civil action was not—under the statute—affected by any notice of a right to sue. Yet they cynically attempted to control the statutory time period for their own ends by manipulating the time of the sending of a notice of a right to sue. It does not seem "inequitable" to apply the plain words of the statute and to find that the commencement of this civil action under the 1964 Act was too late.

The motion of TWA for partial summary judgment is granted. The claims in the second amended complaint based on the Civil Rights Act of 1964 are dismissed for lack of jurisdiction over the subject matter and all parts of that pleading which relate to such claims are struck out. Settle order and judgment on notice which should include the direction and determination required by Fed. R.Civ.P. 54(b).

It seems reasonably clear that an appeal may be taken from the final judgment to be entered on this decision, but if counsel conclude that an appeal must be taken under the procedure provided in 28 U.S.C. § 1292(b) the appropriate statement will be made by me.

An expedited appeal to the Court of Appeals is advisable so that, if possible, the guidance of that Court can be obtained before the completion of the trial

of this action which, although commenced, will necessarily (because of this Court's trial calendar) have to be adjourned from time to time for substantial periods.