**Gregory R. WILSON, Plaintiff,**

and

**Mark N. Peeples, Intervenor,**

v.

**SOUTHWEST AIRLINES COMPANY, Defendant.**

**Civ. A. No. CA–3–80–0680–G.**

United States District Court,
N. D. Texas,
Dallas Division.

June 12, 1981.

Donald J. Maison, Jr., Law Offices of James C. Barber, Kenneth H. Molberg, Dallas, Tex., for plaintiff and intervenor.

Manitzas, Harris & Padgett, Inc., Shelton E. Padgett, San Antonio, Tex., Akin, Gump, Hauer & Feld, John L. Hauer, Dallas, Tex., for defendant.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This case presents the important question whether femininity, or more accurately female sex appeal, is a bona fide occupational qualification ("BFOQ") for the jobs of flight attendant and ticket agent with Southwest Airlines. Plaintiff Gregory Wilson and the class of over 100 male job applicants he represents have challenged Southwest's open refusal to hire males as a violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* The class further alleges that Southwest's published height-weight requirement for flight attendants operates to exclude from eligibility a greater proportion of male than female applicants.[1]

At the phase one trial on liability, Southwest conceded that its refusal to hire males was intentional. The airline also conceded that its height-weight restrictions would have an adverse impact upon male applicants, if actually applied. Southwest contends, however, that the BFOQ exception to Title VII's ban on sex discrimination, 42 U.S.C. § 703(e), justifies its hiring only females for the public contact positions of flight attendant and ticket agent. The BFOQ window through which Southwest attempts to fly permits sex discrimination in situations where the employer can prove that sex is a "bona fide occupational qualification reasonably necessary to the normal

operation of that particular business or enterprise." *Id.* Southwest reasons it may discriminate against males because its attractive female flight attendants and ticket agents personify the airline's sexy image and fulfill its public promise to take passengers skyward with "love." Defendant claims maintenance of its females-only hiring policy is crucial to the airline's continued financial success.

Since it has been admitted that Southwest discriminates on the basis of sex, the only issue to decide is whether Southwest has proved[2] that being female is a BFOQ reasonably necessary to the normal operation of its particular business. As the application of § 703(e) depends, in large part, upon an analysis of the employer's "particular" business, it is necessary to set forth the factual background of this controversy as a predicate to consideration of Southwest's BFOQ defense. The facts are undisputed.

*Factual Background.*

Defendant Southwest Airlines is a scheduled air carrier engaged in the transportation of passengers. Southwest's inaugural flight was June 18, 1971. It presently serves major cities in Texas, Oklahoma, Louisiana and New Mexico.

Southwest was incorporated in March of 1967 and filed its initial application with the Texas Aeronautics Commission ("TAC") in November of 1967 to serve the intrastate markets of Dallas, Houston and San Antonio. Southwest's proposed entry as an intrastate commuter carrier sparked a hostile reaction from the incumbent air carriers serving the Texas market. The airline's application to the TAC was bitterly contested and the original TAC decision to permit Defendant to begin serving Dallas, Houston and San Antonio was litigated for over four

---

1. The airline solicits applications from males for the flight attendant position and publishes a 5 foot, 9 inch eligibility requirement for males, though it has never hired and refuses to hire males. The evidence offered by Plaintiffs in support of their claim of adverse impact was not answered. *See* Plaintiff's Exhs. 22, 23.

2. Once sex discrimination has been admitted or proved, the burden shifts to the defendant to

prove that sex is a bona fide occupational qualification. *Weeks v. Southern Bell Telephone & Telegraph*, 408 F.2d 228, 232 (5th Cir. 1969). The placement of the burden of proof, however, is not outcome determinative in this case. That is, even if plaintiff's burden of persuasion required him to prove the inapplicability of the BFOQ, the result is the same.

years through a succession of state and federal courts. The legal controversy was not resolved until December of 1970, when the U.S. Supreme Court denied the incumbent air carriers' petition for a *writ of certiorari*. According to Southwest's Chairman Herbert Kelleher, the airline in the interim had lost a commitment from a major insurance company to purchase $3 million of preferred stock; had lost a commitment for the sale of aircraft necessary to commence operations; had lost $2 million in subscriptions for stock by individual investors; and had spent over $530,000 in legal fees litigating the issue of its right to commence operations, all as a result of the defensive tactics of Southwest's competitors. In December of 1970, Southwest had $143 in the bank and was over $100,000 in debt, though no aircraft had ever left the ground.

Barely intact, Southwest, in early 1971, called upon a Dallas advertising agency, the Bloom Agency, to develop a winning marketing strategy. Planning to initiate service quickly, Southwest needed instant recognition and a "catchy" image to distinguish it from its competitors.

The Bloom Agency evaluated both the images of the incumbent competitor airlines as well as the characteristics of passengers to be served by a commuter airline. Bloom determined that the other carriers serving the Texas market tended to project an image of conservatism. The agency also determined that the relatively short haul commuter market which Southwest hoped to serve was comprised of predominantly male businessmen. Based on these factors, Bloom suggested that Southwest break away from the conservative image of other airlines and project to the traveling public an airline personification of feminine youth and vitality. A specific female personality description was recommended and adopted by Southwest for its corporate image:

> This lady is young and vital ... she is charming and goes through life with great flair and exuberance ... you notice first her exciting smile, friendly air, her wit ... yet she is quite efficient and approaches all her tasks with care and attention....

From the personality description suggested by The Bloom Agency, Southwest developed its now famous "Love" personality. Southwest projects an image of feminine spirit, fun and sex appeal. Its ads promise to provide "tender loving care" to its predominantly male, business passengers.[3] The first advertisements run by the airline featured the slogan, "AT LAST THERE IS SOMEBODY ELSE UP THERE WHO LOVES YOU." Variations on this theme have continued through newspaper, billboard, magazine and television advertisements during the past ten years.[4] Bloom's "Love" campaign was given a boost in 1974–1975 when the last of Southwest's competitors moved its operations to the new Dallas/Fort Worth Regional Airport, leaving Southwest as the only heavy carrier flying out of Dallas' convenient and fortuitously named, Love Field.

Over the years, Southwest gained national and international attention as the "love airline." Southwest Airlines' stock is traded on the New York Stock Exchange under the ticker symbol "LUV". During 1977 when Southwest opened five additional markets in Texas, the love theme was expanded to "WE'RE SPREADING LOVE ALL OVER TEXAS."

T.V. commercials feature attractive attendants in fitted outfits, catering to male passengers while an alluring feminine voice promises inflight love. On board, attendants in hot-pants (skirts are now optional) serve "love bites" (toasted almonds) and "love potions" (cocktails). Even Southwest's ticketing system features a "quickie machine" to provide "instant gratification."

3. According to an October, 1979 on-board marketing survey commissioned before this lawsuit was filed, 69.01% of the respondents were male, while 58.41% of all respondents listed their occupation as either professional/technical, manager/administrator, or sales. Only 49.75% of the passengers surveyed, however, gave "business" as the reason for their trip.

4. Unabashed allusions to love and sex pervade all aspects of Southwest's public image. Its

As an integral part of its youthful, feminine image, Southwest has employed only females in the high customer contact positions of ticket agent and flight attendant. From the start, Southwest's attractive personnel, dressed in high boots and hot-pants, generated public interest and "free ink." Their sex appeal has been used to attract male customers to the airline. Southwest's flight attendants, and to a lesser degree its ticket agents, have been featured in newspaper, magazine, billboard and television advertisements during the past ten years. Some attendants assist in promotional events for other businesses and civic organizations. Southwest flight attendants and ticket agents are featured in the company's in-flight magazine and have received notice in numerous other national and international publications.[5] The airline also encourages its attendants to entertain the passengers and maintain an atmosphere of informality and "fun" during flights. According to Southwest, its female flight attendants have come to "personify" Southwest's public image.

Southwest has enjoyed enormous success in recent years.[6] This is in no small part due to its marketing image. Though Southwest now enjoys a distinct advantage by operating its commuter flights out of "convenient" Love and Hobby Fields, the airline achieved a commanding position in the regional commuter market while flying "wing tip to wing tip" with national carriers who utilized the same airport, fares, schedules, and aircraft. The evidence was undisputed that Southwest's unique, feminized image played and continues to play an important role in the airline's success.[7]

Less certain, however, is Southwest's assertion that its females-only hiring policy is necessary for the continued success of its image and its business. Based on two on-board surveys, one conducted in October, 1979, before this suit was filed, and another in August, 1980, when the suit was pending,[8] Southwest contends its attractive flight attendants are the "largest single component" of its success. In the 1979 survey, however, of the attributes considered most important by passengers, the category "courteous and attentive hostesses" ranked fifth in importance behind (1) on time departures, (2) frequently scheduled departures, (3) friendly and helpful reservations and ground personnel, and (4) convenient

---

5. For example, in 1974 a Southwest Airlines' flight attendant was featured on the cover of *Esquire* magazine as being "the best in America."

6. From 1979 to 1980, the company's earnings rose from $17 million to 28 million when most other airlines suffered heavy losses. As a percentage of revenues, Southwest's return is considered to be one of the highest in the industry.

7. Even Plaintiff Wilson in his original charge filed with the Equal Employment Opportunity Commission stated:

    The airline [Southwest] does not hire male flight attendants and has built its business by attracting businessmen and employing attractive female flight attendants.

8. The results of a briefer third survey conducted on March 10–11, 1981 at the request of Southwest's trial counsel cannot be considered. Conducted expressly to "determine" passenger preference for females in anticipation of trial, the survey showed bias and lacked statistical reliability for many reasons. Among other problems, the survey suffered from non-random sampling [passengers were sampled only at Love (Dallas) and Hobby (Houston) Fields, during the prime hours for business transportation (6:15–11:00 A.M.) and a disproportionately high (80%) number of males were included], and from a loaded setting [Southwest employed Kelly Temporary Services (59 of 60 interviewers were female) to conduct face-to-face interviews (the interviewers asked questions and recorded the responses) who identified themselves as agents of Southwest]. The survey also asked "loaded" and "double" questions, Question 10, for example, stated; "Southwest feels its 'Love Image' as featured by its attractive female flight attendants and ticket agents is one of the reasons people prefer to use Southwest over other airlines. If you could fly on another airline for the same price, out of the same airport, would you be as likely to use the services of Southwest, if Southwest changed this image—that is, would you be as likely to fly Southwest if they substituted males for some of the female flight attendants and ticket agents?" Given these deficiencies, and the failure to perform any test for statistical reliability, the survey conclusion that hiring males would have a negative impact on Southwest's business cannot be given weight.

departure times,[9] Defendant's Exh. 1 at 2 (¶ 17) and 39 (Question 14). Apparently, one of the remaining eight alternative categories, "attractive hostesses," was not selected with sufficient frequency to warrant being included in the reported survey results.

In another section of the 1979 survey labeled "likes/dislikes," where passengers were given an opportunity to select one or more attributes they liked about Southwest, the alternative "pleasant/friendly/courteous personnel/hostesses" was selected in "6.49% of the responses,"[10] while "attractive hostesses" got a 5.60% response. The categories "economical" (10.01%), "location" (Love and Hobby) (6.87%), and "convenience" (6.43%) were selected as, or more, often than the personnel/hostess attributes. Summing the two "hostess" percentages, the surveyors concluded that "their combined ratings make them the largest single component of your corporate image. *For many of your passengers, the hostesses are Southwest Airlines.*" (original emphasis) Defendant's Exh. 1, at 15. The Court, however, need not be versed in the techniques of opinion polling to question the soundness of this conclusion on the basis of summing the responses to the two hostess questions. Whatever the percentage figures represent, it is plain that in combining the figures, the survey corporation made no attempt to account for either passengers who selected both personnel/hostess responses, or for passengers who did not give any response at all. More objectionable is concluding that hostesses are the "largest single component" of the airline's image when no other attributes relating to image were presented. Even ignoring these and other deficiencies, the questions on their face say nothing about passenger preference, if any, for female flight attendants instead of males. At most, then, the responses indi-

cate that pleasant, attractive personnel are attributes some passengers liked about Southwest.

The 1980 survey proves nothing more. *See* Defendant's Exh. 49 at 22, 23. Indeed, rather than Southwest's female personnel being the "sole factor" distinguishing the airline from its competitors, as Defendant contends, the 1980 survey lists Southwest's "personnel" as only one among five characteristics contributing to Southwest's public image. *Id.* at 25, Chart No. 27. Accordingly, there is no persuasive proof that Southwest's passengers prefer female over male flight attendants and ticket agents, or, of greater importance, that they would be less likely to fly Southwest if males were hired.

In evaluating Southwest's BFOQ defense, therefore, the Court proceeds on the basis that "love," while important, is not everything in the relationship between Defendant and its passengers. Still, it is proper to infer from the airline's competitive successes that Southwest's overall "love image" has enhanced its ability to attract passengers. To the extent the airline has successfully feminized its image and made attractive females an integral part of its public face, it also follows that femininity and sex appeal are qualities related to successful job performance by Southwest's flight attendants and ticket agents. The strength of this relationship has not been proved. It is with this factual orientation that the Court turns to examine Southwest's BFOQ defense.

*Interpretations of the Bona Fide Occupational Qualification.*

To begin, Section 703(a) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(a) (Title VII) provides:

(a) It shall be an unlawful employment practice for an employer—

---

**9.** Of the attributes reported, "delivering checked baggage promptly" ranked sixth in importance while "lower fares" ranked seventh.

**10.** Just what these percentage figures mean is impossible to determine from the survey report. The report does not indicate whether the percentage for each question represents the percentage of the sum of attributes selected, or the percentage of passengers who selected each attribute. Neither does the survey account for the passengers, if any, who did not respond at all to the "likes/dislikes" question.

(1) to fail or refuse to hire ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin.

The broad scope of Title VII's coverage is qualified by Section 703(e), 42 U.S.C. § 2000e–2(e), the BFOQ exception. Section 703(e) states:

(e) Notwithstanding any other provision of this subchapter,

(1) It shall not be an unlawful employment practice for an employer to hire [an employee] : .. on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

The BFOQ defense is available in cases involving intentional as well as unintentional discrimination.[11]

Congress provided sparse evidence of its intent when enacting the BFOQ exception to Title VII.[12] The only relevant remarks [13] from the floor of the House were those of Representative Goodell of New York who proposed adding "sex" as a BFOQ category after sex was designated a prohibited classification under Title VII. She stated:

There are so many instances where the matter of sex is a bona fide occupational qualification. For instance, I think of an elderly woman who wants a female nurse. There are many things of this nature which are bona fide occupational qualifications, and it seems to me they would be properly considered here as an exception.

110 Cong.Rec. 2718 (1964).

Most often relied upon [14] as a source of legislative intent is the Interpretative Memorandum of Title VII submitted by the Senate Floor Managers of the Civil Rights Bill. 110 Cong.Rec. 7212 (1964). The Memorandum referred to the BFOQ as a "limited exception" to the Act's prohibition against discrimination, conferring upon employers a "limited right to discriminate on the basis of religion, sex, or national origin where the reason for the discrimination is a bona fide occupational qualification." *Id.* at 7213. As examples of "legitimate discrimination," the memorandum cited "the preference of a French restaurant for a French cook, the preference of a professional baseball team for male players, and the preference of a business which seeks the patronage of members of particular religious groups for a salesman of that religion...." *Id.* In *Dothard v. Rawlinson, supra,* 433 U.S. at 334, 97 S.Ct. at 2729, the Court cited the Memorandum in support of its conclusion that Congress intended the BFOQ as an "extremely narrow exception" to Title VII's

---

**11.** The BFOQ defense is not to be confused with the doctrine of "business necessity" which operates only in cases involving unintentional discrimination, when job criteria which are "fair in form, but discriminatory in operation" are shown to be "related to" job performance. *See Swint v. Pullman-Standard,* 624 F.2d 525, 534 (5th Cir. 1980) *cert. granted in part* —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981); *Miller v. Texas State Board of Barber Examiners,* 615 F.2d 650, 653 (5th Cir.) *cert. denied* 449 U.S. 891, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). Southwest has stipulated that it is flying only under the BFOQ defense.

**12.** Because sex was added as a prohibited classification in a last minute attempt by opponents to block passage of the Civil Rights Bill, House consideration of the BFOQ exception for sex was limited to the final day for House debate on the Bill. *See* 110 Cong.Rec. 2577

(remarks of Rep. Smith) 2581–82 (remarks of Rep. Green) (1964). *See also Barnes v. Costle,* 561 F.2d 983, 987 (D.C.Cir. 1977); Sirota: "Sex Discrimination Title VII and the Bona Fide Occupational Qualification," 55 Tex.L.Rev. 1025, 1027 (1977).

**13.** Two other members inquired how the BFOQ would apply to specific situations, but their questions went unanswered. 110 Cong.Rec. 2720 (1964) (remarks of Reps. Mutler and Green).

**14.** *See, e. g. Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977); *Swint v. Pullman-Standard, supra,* 624 F.2d at 535; *Diaz v. Pan American World Airways, Inc.,* 311 F.Supp. 559, 569 (S.D.La.), *rev'd* 442 F.2d 385 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).

prohibition against sex discrimination, ignoring Representative Goodell's broader construction. *See* Sirota, *supra*, note 12, at 1029 n.26. The Fifth Circuit in *Swint v. Pullman-Standard, supra*, 624 F.2d at 535, relied on this same Memorandum for the proposition that Congress intended that customer preference might be considered when applying the BFOQ exception.

The final indication of congressional intent is furnished by the Senate Debate on the Civil Rights Bill. By its actions, the Senate implied what it did not intend the BFOQ provision to mean. Pertinent to the inquiry in this case, the Senate defeated by a vote of 61 to 30 an amendment offered by Senator McClellan, which proposed that no unemployment practice would occur

> where *the employer involved believes*, on the basis of substantial evidence, that the hiring of such an individual of a particular race, color, sex, or national origin will be *more beneficial* to the normal operation of the particular business or enterprise involved, or to the *good will* thereof, than the hiring of an individual without consideration of his race, color, religion, sex or national origin, or . . . [where] an employer . . . fail[s] or refuse[s] to hire any individual in those certain instances where the employer involved believes, on the basis of substantial evidence, that the hiring of such individual would *not be in the best interests* of the particular business or enterprise involved, or for the *good will* thereof.

110 Cong.Rec. 13825–26 (1964) (emphasis added). *See Barnes v. Costle, supra*, 561 F.2d at 991 n.58. In debate, Senator McClellan had stated the amendment's purpose was to protect an employer's right to make hiring decisions based on its own business judgment. Senator Case, one of the Floor Managers, responded that passage of such a broad amendment would effectively nullify Title VII. As one commentator has noted, a plausible implication from defeat of the McClellan "best interests" Amendment, is that the Senate did not intend to weaken Title VII's prohibition against sex discrimination by allowing an employer to consider customer attitudes and prefer-ences, a major component of good will, when making hiring decisions. *See* Sirota, *supra*, note 12, at 1030.

Early on, the Equal Employment Opportunity Commission ("EEOC"), created by Congress to administer Title VII, pronounced that "the bona fide occupational qualification as to sex should be interpreted narrowly." *See EEOC Guidelines on Discrimination Because of Sex*, 29 C.F.R. § 1604.2(a) (1965). The agency Guidelines further stated that the BFOQ exception did not justify "the refusal to hire an individual because of the preferences of . . . the employer, clients or customers," except where necessary for authenticity as provided in § 1604.2(a)(2). *Id.* at § 1604.2(a)(1)(iii); *see also* 1979 *Guidebook to Fair Employment Practices* (CCH).

To date, the Commission has steadfastly adhered to its position that customer preference gives rise to a bona fide occupational qualification for sex in one instance only, "[w]here it is necessary for the purpose of authenticity or genuineness . . . e. g. an actor or actress." *Id.* at § 1604.2(a)(2) *as amended by* 45 Fed.Reg. 74676 (Nov. 10, 1980). This exception is analogous to the example of a BFOQ for a French Cook in a French restaurant suggested by the Senate Floor Managers in their Interpretative Memorandum, *supra*, 110 Cong.Rec. at 7213 (1964).

An illustration of the EEOC's refusal to recognize a BFOQ for sex based on customer preference is EEOC Decision No. 71–2338, 1973 EEOC Dec. 4437 (1971). There, the Commission considered an employer's refusal to promote a female to the position of branch manager because the job involved accompanying male customers to football games, dinners and on hunting trips. The customer's preference for male hosts, the Commission held, did not warrant recognition of a BFOQ for sex. *Id.* at 4438. The EEOC also had occasion to consider an employer's refusal to hire a female as a courier guard-driver for an armored car. EEOC Decision No. 70–11, 1973 EEOC Dec. 4048 (1969). In rejecting the employer's defense

that loss of customer confidence in the company's ability to provide security created a BFOQ for male sex, the Commission stated, "this argument is, in law, without merit, since it presumes that customers' desires may be accommodated even at the price of rendering nugatory the will of Congress." *Id.* at 4049. To this Court's knowledge, the EEOC has never recognized a BFOQ for sex except for positions in the entertainment industry where sex authenticity is an essential qualification.[15] *See* EEOC, "Toward Job Equality for Women" 5 (1969) (informal publication).

Those courts which have analyzed Title VII's BFOQ exception, however, have broadened its sweep. Consistent with the language of § 703(e), courts have held, or stated, that customer preference for one sex may be taken into account in those limited instances where satisfying customer preference is "reasonably necessary to the normal operation of the particular business or enterprise." *See, e. g., Avigliano v. Sumitomo Shoji America, Inc.*, 638 F.2d 552 (2nd Cir. 1981); *Swint v. Pullman-Standard, supra; Diaz v. Pan American World Airways, Inc., supra; Fernandez v. Wynn Oil Co.*, 20 FEP Cases 1162 (C.D.Cal.1979). *But see, Sprogis v. United Air Lines*, 444 F.2d 1194 (7th Cir.) *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

This Circuit's decisions in *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228 (5th Cir. 1969) ("Weeks") and *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th Cir.) *cert. denied* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971) ("Diaz") have given rise to a two step BFOQ test: (1) does the particular *job* under consideration require that the worker be of one sex only;

and if so, (2) is that requirement reasonably necessary to the "essence" of the employer's business. *See, Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 228 n.8, 234 nn.24–27 (5th Cir. 1976); [1977] Empl. Prac. Guide (CCH) ¶ 287. The first level of inquiry is designed to test whether sex is so essential to job performance that a member of the opposite sex simply could not do the same job. *See Fernandez v. Wynn Oil Co., supra*, 20 FEP Cases at 1164. As stated in *Weeks, supra*, 408 F.2d at 235:

> [T]o rely on the bona fide occupational qualification exception, an employer has the burden of proving that he had reasonable cause to believe, that is a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.

The second level is designed to assure that the qualification being scrutinized is one so important to the operation of the business that the business would be undermined if employees of the "wrong" sex were hired. *See, Usery v. Tamiami Trail Tours, Inc., supra*, 531 F.2d at 235, n.27; *Touhy v. Ford Motor Co.*, 22 FEP Cases 1492, 1494 (E.D. Mich.1980). *Diaz's* "essence of the business" rule has now been adopted by every Circuit that has considered the matter.[16] As the court there explained:

> . . . [T]he use of the word "necessary" in Section 703(e) requires that we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.

*Arritt v. Grisell*, 567 F.2d 1267, 1271 (4th Cir. 1977); *Manhart v. Los Angeles Department of Water and Power*, 553 F.2d 581, 587 (9th Cir. 1976), *vacated on other grounds*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859, 862 (7th Cir. 1974) *cert. denied sub nom.*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). *See also, Dothard v. Rawlinson, supra*, 433 U.S. at 333, 97 S.Ct. at 2728 (citing *Diaz* and *Weeks*).

---

**15.** Deference is to be given the agency construction of the BFOQ exception because of its consistent adherence to and application of the "guidelines." *Dothard v. Rawlinson, supra*, 433 U.S. at 334, n.19, 97 S.Ct. at 2729, n.19; *Diaz v. Pan American World Airways, Inc., supra*, 442 F.2d at 389 (EEOC rejection of customer preference entitled to "great deference").

**16.** *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1085 (8th Cir.) *cert. denied* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980);

*Diaz, supra,* 442 F.2d at 388 (original emphasis).[17]

Southwest concedes with respect to the *Weeks* test that males are able to perform safely and efficiently all the basic, mechanical functions required of flight attendants and ticket agents. Indeed, any argument to the contrary has been foreclosed by the decisions of this Circuit in *Diaz* and *Hailes v. United Air Lines,* 464 F.2d 1006, 1008 n.2 (5th Cir. 1972). ("It is settled law in this Circuit that female sex is not a bona fide occupational qualification for the position of airline cabin attendant"). *See also, In re National Airlines,* 14 FEP Cases 1806, 1816 (S.D.Fla.1977); EEOC Opinion, "Flight Cabin Attendant," 33 Fed.Reg. 3361 (1968).[18] Southwest's position, however, is that females are required to fulfill certain non-mechanical aspects of these jobs: to attract those male customers who prefer female attendants and ticket agents, and to preserve the authenticity and genuineness of Southwest's unique, female corporate personality.

A similar, though not identical, argument that females could better perform certain non-mechanical functions required of flight attendants was rejected in *Diaz.* There, the airline argued and the trial court found that being female was a BFOQ because women were superior in "providing reassurance to anxious passengers, giving courteous personalized service and, in general, making flights as pleasurable as possible

within the limitations imposed by aircraft operations." *Id.* 442 F.2d at 387; 311 F.Supp. 559, 563 (S.D.Fla.1970). Although it accepted the trial court findings, the Court of Appeals reversed, holding that femininity was not a BFOQ, because catering to passengers psychological needs was only "tangential" to what was "reasonably *necessary"* for the business involved (original emphasis). *Id.* at 388. Characterizing the "essence" or "primary function" of *Pan American's* business as the safe transportation of passengers from one point to another, the court explained:

> While a pleasant environment, enhanced by the obvious cosmetic effect that female stewardesses provide as well as, according to the findings of the trial court, their apparent ability to perform the non-mechanical functions of the job in a more effective manner than most men, may all be important, they are tangential to the essence of the business involved. No one has suggested that having male stewards will so seriously affect the operation of the airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another.

*Id.* at 388.

Similar reasoning underlay the appellate court's rejection of Pan American's claim that its customers' preference for female attendants justified its refusal to hire males.[19] Because the non-mechanical functions that passengers preferred females to

---

**17.** Because *Diaz* adopted and added to the job based BFOQ test in *Weeks,* the decisional focus is not altogether clear. Although there is only one *Diaz* test, some courts have applied it in slightly different ways, at times focusing on the essence of the *employment position* in question, or the *particular business need* which the position fulfills, rather than focusing upon the relationship between the sex qualification and the essence of the *total business operation. See, e. g., Swint v. Pullman-Standard, supra,* 624 F.2d at 534 (dicta); *Fernandez v. Wynn Oil Co., supra,* 20 FEP Cases at 1165. *See also,* Sirota, *supra* note 12, at 1043 n.113. Practically, this difference in application will rarely be outcome determinative. A finding that one sex is essential to job performance will almost by necessity require the conclusion that the essence of the business operation would be undermined by not hiring members of that sex

exclusively. The exception would be where the job or business need requiring employees of one sex only could be eliminated entirely without "undermining" the business itself. Such a situation is not presented here.

**18.** Citing numerous charges of airline discrimination against males, the EEOC in its 1968 "Flight Cabin Attendant" Opinion specifically concluded that "the basic duties of a flight cabin attendant ... can be satisfactorily performed by members of both sexes."

**19.** Based upon a "scientific" opinion survey conducted by the Air Transport Association of America, as well as other evidence, the district court found that "Pan Am's passengers overwhelmingly

perform were tangential to the airline's business, the court held, "the fact that customers prefer [females] cannot justify sex discrimination." *Id.* at 389. The Fifth Circuit in *Diaz* did not hold that customer preference could never give rise to a sex BFOQ. Rather, consistent with the EEOC's exception for authenticity and genuineness,[20] the Court allowed that customer preference could "be taken into account only when it is based on the company's inability to perform the primary function or service it offers," that is, where sex or sex appeal is itself the dominant service provided.[21]

█ *Diaz* and its progeny establish that to recognize a BFOQ for jobs requiring multiple abilities, some sex-linked and some sex-neutral, the sex-linked aspects of the job must predominate. Only then will an employer have satisfied *Weeks'* requirement that sex be so essential to successful job performance that a member of the opposite sex could not perform the job. An illustration of such dominance in sex cases is the exception recognized by the EEOC for authenticity and genuineness. *Supra* at note 20. In the example given in § 1604.-2(a)(2), that of an actor or actress, the primary function of the position, its essence, is to fulfill the audience's expectation and desire for a particular role, characterized by particular physical or emotional traits. Generally, a male could not supply the authenticity required to perform a female role. Similarly, in jobs where sex or vicarious sexual recreation is the primary service provided, *e. g.* a social escort or topless dancer, the job automatically calls for one sex exclusively; the employee's sex and the service provided are inseparable. Thus, being female has been deemed a BFOQ for the position of a Playboy Bunny, female sexuality being reasonably necessary to perform the dominant purpose of the job which is forthrightly to titillate and entice male customers. *See St. Cross v. Playboy Club,* Appeal No. 773, Case No. CFS 22618–70 (New York Human Rights Appeal Board, 1971) (dicta); *Weber v. Playboy Club,* Appeal No. 774, Case No. CFS 22619–70 (New York Human Rights Appeal Board, 1971) (dicta). One court has also suggested, without holding, that the authenticity exception would give rise to a BFOQ for Chinese nationality where necessary to maintain the authentic atmosphere of an ethnic Chinese restaurant, *Utility Workers v. Southern California Edison,* 320 F.Supp. 1262, 1265 (C.D.Cal.1970).[22] Consistent with the language of *Diaz,* customer preference for one sex only in such a case would logically be so strong that the employer's ability to perform the primary function or service offered would be undermined by not hiring members of the authentic sex or group exclusively.[23]

The Court is aware of only one decision where sex was held to be a BFOQ for an

---

**20.** 29 C.F.R. § 1604.2(a)(2) *as amended by* 45 Fed.Reg. 74676.

**21.** Except under limited circumstances, the *Diaz* court reasoned, the purpose of Title VII to overcome stereotyped thinking about the job abilities of the sexes would be undermined if customer expectations, preferences, and prejudices were allowed to determine the validity of sex discrimination in employment. *Id.* at 389; *see also, Long v. Sapp,* 502 F.2d 34, 40 (5th Cir. 1974) (subjective doubts about the ability of one sex to perform a particular job, which may themselves be based upon impermissible stereotypes, are no substitute for the objective evidence demanded by *Weeks* ).

**22.** Similarly, in *Avigliano v. Sumitomo Shoji America, Inc.,* 638 F.2d 552 (2nd Cir. 1981), the Second Circuit remanded for a determination whether being of Japanese nationality was a BFOQ for management positions in a Japanese firm's U.S. subsidiary.

**23.** Customer preference may also give rise to a BFOQ for one sex where the preference is based upon a desire for sexual privacy. The privacy right has been recognized in a variety of situations, including disrobing, sleeping, or performing bodily functions in the presence of the opposite sex. *See, e. g. Fesel·v. Masonic Home of Delaware, Inc.,* 428 F.Supp. 573 (D.Del., 1977); *Mieth v. Dothard,* 418 F.Supp. 1169, 1184–85 (M.D.Ala.1976) (three-judge District Court) *aff'd in part, rev'd in part sub nom. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Reynolds v. Wise,* 375 F.Supp. 145, 151 (N.D.Tex.1973); EEOC, *Toward Job Equality for Women* 5 (1969). *See also,* Sirota, *supra,* note 12, at 1060–65.

occupation not providing primarily sex oriented services. In *Fernandez v. Wynn Oil Co.*, 20 FEP Cases 1162 (C.D.Cal.1979), the court approved restricting to males the job of international marketing director for a company with extensive overseas operations. The position involved primarily attracting and transacting business with Latin American and Southeast Asian customers who would not feel comfortable doing business with a woman. The court found that the customers' attitudes, customs, and mores relating to the proper business roles of the sexes created formidable obstacles to successful job performance by a woman. South American distributors and customers, for example, would have been offended by a woman conducting business meetings in her hotel room. Applying the *Diaz* test, the court concluded that hiring a female as international marketing director "would have totally subverted any business [defendant] hoped to accomplish in those areas of the world." *Id.* at 1165.[24] Because hiring a male was *necessary* to the Defendant's ability to continue its foreign operations, sex was deemed a BFOQ for the marketing position.

*Application of the Bona Fide Occupational Qualification to Southwest Airlines.*

■ Applying the first level test for a BFOQ, with its legal gloss, to Southwest's particular operations results in the conclusion that being female is not a qualification required to perform successfully the jobs of flight attendant and ticket agent with Southwest. Like any other airline, Southwest's primary function is to transport passengers safely and quickly from one point to another.[25] *See, e. g. Diaz, supra,* 442

F.2d at 388. To do this, Southwest employs ticket agents whose primary job duties are to ticket passengers and check baggage, and flight attendants, whose primary duties are to assist passengers during boarding and deboarding, to instruct passengers in the location and use of aircraft safety equipment, and to serve passengers cocktails and snacks during the airline's short commuter flights. Mechanical, non-sex-linked duties dominate both these occupations. Indeed, on Southwest's short-haul commuter flights there is time for little else. That Southwest's female personnel may perform their mechanical duties "with love" does not change the result. "Love" is the manner of job performance, not the job performed.

While possession of female allure and sex appeal have been made qualifications for Southwest's contact personnel by virtue of the "love" campaign, the functions served by employee sexuality in Southwest's operations are not dominant ones. According to Southwest, female sex appeal serves two purposes: (1) attracting and entertaining male passengers and (2) fulfilling customer expectations for female service engendered by Southwest's advertising which features female personnel. As in *Diaz*, these non-mechanical, sex-linked job functions are only "tangential" to the essence of the occupations and business involved. Southwest is not a business where vicarious sex entertainment is the primary service provided. Accordingly, the ability of the airline to perform its primary business function, the transportation of passengers, would not be jeopardized by hiring males.

---

**24.** In reaching its conclusion, the court followed *Diaz* in adopting a very narrow standard for weighing customer preference, stating:

Customer preferences should not be bootstrapped to the level of business necessity. The only occasion where customer preference will rise to the dignity of a bona fide occupational qualification is where no customer will do business with a member of one sex either because it would destroy the essence of the business or would create serious safety and efficiency problems.

*Id.* at 1165.

**25.** Southwest's argument that its primary function is "to make a profit," not to transport passengers, must be rejected. Without doubt the goal of every business is to make a profit. For purposes of BFOQ analysis, however, the business "essence" inquiry focuses on the particular service provided and the job tasks and functions involved, not the business goal. If an employer could justify employment discrimination merely on the grounds that it is necessary to make a profit, Title VII would be nullified in short order.

Southwest does not face the situation anticipated in *Diaz*[26] and encountered in *Fernandez* where an established customer preference for one sex is so strong that the business would be undermined if employees of the opposite sex were hired. Southwest's claim that its customers prefer females rests primarily upon inferences drawn from the airline's success after adopting its female personality. But according to Southwest's own surveys, that success is attributable to many factors. There is no competent proof that Southwest's popularity derives directly from its females-only policy to the exclusion of other factors like dissatisfaction with rival airlines and Southwest's use of convenient Love and Hobby Fields. Nor is there competent proof that the customer preference for females is so strong that Defendant's male passengers would cease doing business with Southwest as was the case in *Fernandez*. In short, Southwest has failed in its proof to satisfy *Diaz's* business necessity requirement, without which customer preference may not give rise to a BFOQ for sex.

Southwest contends, nevertheless, that its females-only policy is reasonably necessary to the continued success of its "love" marketing campaign. Airline management testified that Southwest's customers will be disappointed if they find male employees after seeing only female personnel advertised. As a matter of law, this argument fails to support a BFOQ for sex. The court in *Diaz* emphasized that its test was one of business *necessity*, not business *convenience. Diaz, supra*, 442 F.2d at 388; *Fernandez v. Wynn Oil Co., supra*, 20 FEP at 1164. In *Weeks v. Southern Bell Telephone and Telegraph Co., supra*, 408 F.2d at 234–35, the Fifth Circuit expressly disapproved of the broad construction of the BFOQ exception in *Bowe v. Colgate Palmolive Co.*, 272 F.Supp. 332, 362 (S.D.Ind.1967) *aff'd in part and rev'd in part* 416 F.2d 711 (7th Cir.

1969) which would have permitted sex discrimination where sex was "rationally related to an end which [the employer] has a right to achieve—production, profit, or business reputation."

It is also relevant that Southwest's female image was adopted at its discretion, to promote a business unrelated to sex. Contrary to the unyielding South American preference for males encountered by the Defendant company in *Fernandez*, Southwest exploited, indeed nurtured, the very customer preference for females it now cites to justify discriminating against males. *See* note 21, *supra*. Moreover, the fact that a vibrant marketing campaign was necessary to distinguish Southwest in its early years does not lead to the conclusion that sex discrimination was then, or is now, a business *necessity*. Southwest's claim that its female image will be tarnished by hiring males is, in any case, speculative at best.

The few cases on point support the conclusion that sex does not become a BFOQ merely because an employer chooses to exploit female sexuality as a marketing tool, or to better insure profitability. In *Guardian Capital Corp. v. New York State Division of Human Rights*, 46 App.Div.2d 832, 360 N.Y.S.2d 937 (1974) *app. dismissed* 48 A.D.2d 753, 368 N.Y.S.2d 594 (1975) for example, the court prohibited an employer from firing male waiters to hire sexually attractive waitresses in an attempt to change the appeal of the business and boost sales. Similarly, in *University Parking, Inc. v. Hotel and Restaurant Employees & Bartenders' Int'l Un.*, 71–2 Lab.Arb.Awards 5360 (1971) (Peck, Arb.), the arbitrator denied an employer's right to replace three waitresses with waiters in order to "upgrade" his business and respond to customer desires for "classier" French service.[27] Merely because Southwest's female image

---

**26.** To reiterate, the Fifth Circuit in *Diaz, supra*, 442 F.2d at 389, announced that "... customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers."

**27.** The EEOC reached the same result in EEOC Decision No. YSF–9–058 1973 EEOC Dec. 4125 (1969).

was established in "good faith"[28] and has become its trademark does not distinguish Defendant's conduct from the discriminatory business decisions disapproved of in these cases.

Neither, in the final analysis, does Southwest's "battle-for-inches" with its competitors rise to the level of business *necessity.* *Diaz's* necessity test focuses on the company's ability "to perform the primary function or service it offers," not its ability to compete. *Diaz, supra,* 442 F.2d at 389. As one court has noted in the context of racial discrimination, "[t]he expense involved in changing from a discriminatory system. . . . [fails to constitute] a business necessity that would justify the continuation of . . . discrimination." *Bush v. Lone Star Steel Co.,* 373 F.Supp. 526, 533 (E.D.Tex.1974); *see also Robinson v. Lorillard Corp.,* 444 F.2d 791, 799 n. 8 (4th Cir.) *cert. dismissed* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) ("dollar cost alone is not determinative"). Similarly, a potential loss of profits or possible loss of competitive advantage following a shift to non-discriminatory hiring does not establish business necessity under *Diaz.* To hold otherwise would permit employers within the same industry to establish different hiring standards based on the financial condition of their respective businesses. A rule prohibiting only financially successful enterprises from discriminating under Title VII, while allowing their less successful competitors to ignore the law, has no merit.

Southwest, however, has failed to establish by competent proof that revenue loss would result directly from hiring males. Analogous to the holding in *Guardian Capital Corp. v. New York State Division of Human Rights, supra,* 360 N.Y.S.2d at 938–39, an employer's mere "beforehand belief" that sex discrimination is a financial imper-

ative, alone, does not establish a BFOQ for sex.

*Conclusion.*

In rejecting Southwest's BFOQ defense, this court follows Justice Marshall's admonition that the BFOQ exception should not be permitted to "swallow the rule." *See Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 545, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971) (Marshall, J. concurring). Southwest's position knows no principled limit. Recognition of a sex BFOQ for Southwest's public contact personnel based on the airline's "love" campaign opens the door for other employers freely to discriminate by tacking on sex or sex appeal as a qualification for any public contact position where customers preferred employees of a particular sex.[29] In order not to undermine Congress' purpose to prevent employers from "refusing to hire an individual based on stereotyped characterizations of the sexes," *see Phillips v. Martin Marietta Corp., supra,* 400 U.S. at 545, 91 S.Ct. at 498, a BFOQ for sex must be denied where sex is merely useful for attracting customers of the opposite sex, but where hiring both sexes will not alter or undermine the essential function of the employer's business. Rejecting a wider BFOQ for sex does not eliminate the commercial exploitation of sex appeal. It only requires, consistent with the purposes of Title VII, that employer's exploit the attractiveness and allure of a sexually integrated workforce. Neither Southwest, nor the traveling public, will suffer from such a rule. More to the point, it is my judgment that this is what Congress intended.

One final observation is called for. This case has serious underpinnings, but it also has disquieting strains. These strains, and they were only that, warn that in our quest

---

**28.** Under Title VII, it is immaterial that Southwest's feminized marketing strategy was conceived and implemented in "good faith," not in a desire to discriminate against males. Even in cases of unintentional discrimination, the absence of bad motive or intent does not redeem employment practices with forbidden discriminatory consequences. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854,

28 L.Ed.2d 158 (1971); *Vuyanich v. Republic National Bank,* 78 F.R.D. 352, 358 (N.D.Tex. 1978).

**29.** *See* Note: "Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964," 84 Harv.L.Rev. 1109, 1185 (1971).

for non-racist, non-sexist goals, the demand for equal rights can be pushed to silly extremes. The rule of law in this country is so firmly embedded in our ethical regimen that little can stand up to its force—except literalistic insistence upon one's rights. And such inability to absorb the minor indignities suffered daily by us all without running to court may stop it dead in its tracks. We do not have such a case here—only warning signs rumbling from the facts.